UNITED STATES of America, Appellee,

v.

Thomas Dean MILLS, Defendant–Appellant.

No. 245, Docket 88–1513.

United States Court of Appeals, Second Circuit.

Argued Oct. 27, 1989.

Decided Feb. 6, 1990.

---

Peter Ginsberg, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. E.D.N.Y., Matthew E. Fishbein, David C. James, Asst. U.S. Attys., Brooklyn, N.Y., on the brief), for appellee.

Gail Jacobs, Great Neck, N.Y., for defendant-appellant.

Before KEARSE and ALTIMARI, Circuit Judges, and CONNER, District Judge.*

* Honorable William C. Conner, Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

KEARSE, Circuit Judge:

Defendant Thomas Dean Mills appeals from a judgment entered in the United States District Court for the Eastern District of New York following a jury trial before Mark A. Costantino, *Judge,* convicting him on one count of possession of counterfeit obligations, in violation of 18 U.S.C. §§ 472 and 3623 (1988), two counts of transfer of counterfeit obligations, in violation of 18 U.S.C. §§ 473 and 3623 (1988), and one count of conspiracy to commit those offenses, in violation of 18 U.S.C. §§ 371 and 3623 (1988). Mills was sentenced to three concurrent five-year prison terms on the conspiracy and transfer counts, a twelve-year prison term on the possession count, to be served consecutively to the five-year terms, and fines totaling $20,000, plus assessments. On appeal, he contends principally that the district court deprived him of his Sixth Amendment right to represent himself at trial. Though we find some aspects of the proceedings below troubling, we find no reversible error.

## I. BACKGROUND

Since there is no challenge to the sufficiency of the proof, the government's trial evidence may be summarized briefly. In September 1987, Secret Service agents arrested John Kelly in possession of $5,400 in counterfeit $100 bills. Kelly agreed to cooperate with the agents. He produced an additional $183,000 in counterfeit bills and identified Mills as a confederate. Kelly allowed the agents to record a telephone conversation with Mills and met with Mills under surveillance. At the meeting, Kelly handed Mills a bag containing $25,000 in counterfeit bills. As Mills walked away with the bag, he was arrested. A search of his car turned up two additional counterfeit $100 bills, one of which bore Mills's palm print.

All of these counterfeit bills had been made using a unique process that, to the knowledge of the Secret Service's chief document analyst, had been used only once before: to make bills found in Mills's possession in 1982, leading to Mills's arrest and conviction of counterfeiting in that year.

### A. *The Pretrial Proceedings Relating to the Role of Counsel*

In the present case, Mills was arraigned in September 1987, and R. James Bradford, a Legal Aid attorney, was appointed to represent him. For the next several months, Bradford filed pretrial motions, obtained discovery, and prepared for trial.

In February 1988, Mills moved both to represent himself and to have Bradford designated as standby counsel. The government joined in the latter request. The court granted Mills's motion to proceed *pro se,* but initially refused to appoint standby counsel.

> THE COURT[:] Do you want a lawyer to sit next to you and tell you what to do. Why should he sit next to you and tell you what to do when you want to do it yourself? I may not let him sit next to you. If you're going to represent yourself do so wholly-and as an adage, as they taught in law school, a client who represents himself has a fool for a lawyer.

(Transcript ("Tr.") of February 22, 1988 Hearing at 3–4.) In response to Mills's contention that he was capable of representing himself at trial if Bradford sat by his side, the court stated

> I'm not going to let him be there. I'll take my chances. If the higher court wants to say, after you are convicted, if you are convicted, then you are in good shape, because I don't think you should use the services of a lawyer as an advisory, where he's the one who has been designated to practice law. You could represent yourself if you want to, but there is no reason why anyone should sit down with you on a case.

(*Id.* at 5.)

Following this colloquy, the court initiated an inquiry into whether Mills was in fact sufficiently indigent to qualify for any legal assistance funded by the government. Finding no financial affidavit in the file, and hearing Mills's oral representation that he had reported income of $60,000 on his

income tax return some years earlier, the court found that Mills was financially ineligible for appointed counsel. The court relieved Bradford from representing Mills and instructed Bradford not to speak with Mills or walk out of the courtroom with him. As the court subsequently described its admonition, "Last time I said I wouldn't let Mr. Bradford talk to him. He wanted to walk out with him. I said 'Mr. Bradford, you stay away from him. You are no longer his lawyer.'" (March 4, 1988 Hearing Tr. at 6.)

Eventually, after the Assistant United States Attorney ("AUSA") brought to the court's attention a financial affidavit filed by Mills and Mills represented that he currently earned $1,000 a month, the court assigned Mills a standby attorney. The court refused to assign Bradford, however. It stated, "I won't assign legal aid. I am going to assign a CJA lawyer.... Not Legal Aid, Criminal Justice Act." (April 25, 1988 Hearing Tr. at 3.) At a later hearing, the court confirmed that "Bradford has been taken off the case." (June 20, 1988 Hearing Tr. at 3.)

The standby counsel appointed for Mills was Charles Lavine. Lavine appeared with Mills at a hearing in September 1988 on a motion by Mills to suppress certain postindictment statements. When Lavine began to cross-examine the government's first witness at the hearing, the court inquired whether Mills had consented to Lavine's conducting the examination. Upon receiving an affirmative response, the court allowed Lavine to conduct the questioning. At the close of the evidence at that hearing, the court refused to permit Mills to make the legal argument:

THE COURT: ... Any statement to be made before the Court?

. . . .

MR. LAVINE: Judge, I believe Mr. Mills—

THE COURT: I will not let Mr. Mills talk. He is represented by a lawyer, and I advised him of that some time ago, that's why we have a local [sic] profession. If he doesn't want to have a law-

yer, he sits there by himself and gets himself into trouble, simple as all of that. (September 12, 1988 Hearing Tr. at 51–52.)

After hearing argument by Lavine, the court denied the motion to suppress. Notwithstanding its successful defense of this motion, the government did not offer the postindictment statements at trial.

B. *Mills's Representation of Himself at Trial*

At the start of the trial, before the jury was brought in, the court addressed Mills as follows:

THE COURT: Before we bring in the jury for the purpose of opening statements, Mr. Mills, arise.

Do you understand at this point that you are waiving the right to have an attorney represent you, as far as asking questions, and any other part of the proceedings, and he's merely in court for you to consult and nothing else? You [sic] will not be permitted to make any objections. . . . . . . . . . . . . . . . . . . .

MR. MILLS: Yes, your Honor.

THE COURT: Do you understand that?

MR. MILLS: I understand.

THE COURT: You waive that right as him representing you at this time, except as a consultant?

MR. MILLS: Yes, your Honor.

(September 13, 1988 Trial Tr. at 2.) Prior to the opening statements, the court advised the jury, *inter alia*, that "the defendant himself has waived the right of his attorney of asking any questions, and the attorney only is a consultant in this case at this time." (*Id.* at 17.)

Throughout the trial, Mills largely represented himself. He made his own opening statement and summation. He conducted the cross-examination of every government witness. He called three witnesses of his own and conducted the examination of each. Most of the objections to government examination, and the oral acquiescences to various proffers, according to the transcript, were voiced by Mills.

On occasion, the transcript indicates that an objection was voiced by Lavine. Fur-

ther, the record indicates that virtually all of Mills's legal arguments to the court outside the presence of the jury were made by Lavine. These included motions for limiting instructions to the jury, a motion for acquittal pursuant to Fed.R.Crim.P. 29, and arguments with respect to the proposed jury charge. Lavine repeatedly disclaimed, however, any creative role in Mills's defense. For example:

> MR. LAVINE: Judge, may I put something on the record?
>
> This is of course a somewhat unusual situation in that the defendant is conducting his own trial. I'm merely here—
>
> THE COURT: That was his wish.
>
> MR. LAVINE: As his advisor—
>
> THE COURT: No effective assistance from counsel, none.

(September 15, 1988 Trial Tr. at 223–24, jury not present.) And on the following trial day, Lavine stated:

> Earlier this morning the Court made some reference to my conduct on behalf of Mr. Mills. The only thing I want to bring to the Court's attention is this; that I am here, as I understand it, in the capacity of being his advisor when he has difficulty formulating questions. I understand it's my responsibility to try and straighten out his question and try to answer his questions with respect to the manner in which he examines the witnesses.
>
> I have had absolutely nothing whatsoever to do with his strategy, his theories of defense or anything like that, your Honor.
>
> I am merely here handling myself as I have described to the Court and I just hope the Court understands and appreciates that.

(September 19, 1988 Trial Tr. at 50–51, jury not present.)

The record indicates that at most, if not all, of the side-bar conferences held during trial, Lavine argued on behalf of Mills, and it appears that Mills was not present. Thus, the first request for a side-bar conference was made by Lavine, who asked, "May we approach side bar just for a moment, the Assistant and myself?" Though the transcription of most of the side-bar conferences does not indicate whether or not Mills was present, at two such conferences, statements are attributed to Mills. The transcript for September 14, 1988, the second day of trial, quotes both Lavine and Mills as making statements at such a conference. The transcript for September 15, 1988, similarly quotes both Lavine and Mills at a side-bar conference. Subsequently at the September 15 session, however, the transcript reveals that Mills was not allowed to attend a side-bar conference with regard to the scheduling of the remainder of the trial:

> THE COURT: Would you want to recess at this time?
>
> MR. GINSBERG [AUSA]: Whatever the Court would like.
>
> Could we have a side bar about the schedule?
>
> THE COURT: All right.
>
> MR. GINSBERG: Thank you.
>
> (A side bar discussion takes place.)
>
> MR. MILLS: I'm pro se, your Honor.
>
> THE COURT: Sit down over there.
>
> MR. LAVINE: Let me object on his behalf.
>
> THE COURT: I know it. I will allow you to do that.

(September 15, 1988 Trial Tr. at 335.)

On September 19, the following trial day, the transcript records Mills as requesting a side bar, which was held. Mills was not quoted as having made any statement at that conference, however, and perhaps it may be inferred that he was excluded, for later that day Lavine made the following statement:

> MR. LAVINE: Before the jury comes in, Mr. Mills is asking me to make certain objections in open court. I believe, most of them we have covered at side bar. I don't know whether he's heard them.
>
> Initially, he's objecting I would suppose—let me take that back. He's objecting and moving for a mistrial based on all of these things:
>
> One, that he's been excluded from the side bar conferences.
>
> . . . .

THE COURT: These are all serious motions.

MR. LAVINE: These are his motions.

THE COURT: I want to make sure. They are serious.

. . . .

THE COURT: Okay. All motions are denied.

(September 19, 1988 Trial Tr. at 50–51.)

Eventually, Mills was convicted and sentenced as described above. This appeal followed.

## II. DISCUSSION

On this appeal, Mills contends principally that the court deprived him of his Sixth Amendment right to represent himself by (a) arbitrarily discharging Bradford, whom he describes as his first standby counsel, (b) restricting Mills's consultation with "substitute" standby counsel, (c) precluding Mills from making legal arguments and attending side-bar conferences, and (d) expressing to the jury its contempt for Mills and his defense. Mills also contends, *inter alia*, that the court erred in admitting evidence concerning his 1982 counterfeiting arrest and conviction and generally treated him unfairly. Though some of the court's actions seem to us arbitrary, we conclude that there is no basis for reversal.

### A. *The Right to Self–Representation*

A defendant in a criminal trial has the right under the Sixth Amendment to waive counsel and conduct his own defense. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). This right encompasses certain specific rights to have his voice heard. The *pro se* defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in *voir dire*, to question witnesses, and to address the court and the jury at appropriate points in the trial. *McKaskle v. Wiggins*, 465 U.S. 168, 174, 104 S.Ct. 944, 949, 79 L.Ed.2d 122 (1984) ("*Wiggins*").

In *Wiggins*, the Supreme Court considered the scope of a *pro se* defendant's Sixth Amendment prerogatives when the court, unsolicited by the defendant, has appointed standby counsel. Noting that "the primary focus must be on whether the defendant had a fair chance to present his case in his own way," *id.* at 177, 104 S.Ct. at 950, the Court outlined two general limitations on the extent of standby counsel's unsolicited participation at trial:

First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury. This is the core of the *Faretta* right. If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded.

Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself. The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear *pro se* exists to affirm the accused's individual dignity and autonomy. . . . From the jury's perspective, the message conveyed by the defense may depend as much on the messenger as on the message itself. From the defendant's own point of view, the right to appear *pro se* can lose much of its importance if only the lawyers in the courtroom know that the right is being exercised.

*Id.* at 178–79, 104 S.Ct. at 951 (footnote omitted) (emphasis in original).

When a defendant's right to represent himself has been violated, he is entitled to a reversal even if he cannot show prejudice. *See Flanagan v. United States*, 465 U.S. 259, 268, 104 S.Ct. 1051, 1056, 79 L.Ed.2d 288 (1984) (obtaining reversal for a violation of "right to represent oneself . . . does not require a showing of prejudice to the defense"); *Wiggins*, 465 U.S. at 177 n. 8, 104 S.Ct. at 950 n. 8 ("Since the right of self-representation is a right that when ex-

ercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless."); *Johnstone v. Kelly,* 808 F.2d 214, 217–19 (2d Cir.), *clarification of mandate denied per curiam,* 812 F.2d 821 (2d Cir. 1986), *cert. denied,* 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987).

■ A defendant may, of course, waive his right to have standby counsel remain in a purely supporting role. Thus, the *Wiggins* Court noted that "it is important not to lose sight of the defendant's own conduct. A defendant can waive his *Faretta* rights." *Wiggins,* 465 U.S. at 182, 104 S.Ct. at 953. The waiver may be express or implied:

A defendant's invitation to counsel to participate in the trial obliterates any claim that the participation in question deprived the defendant of control over his own defense. Such participation also diminishes any general claim that counsel unreasonably interfered with the defendant's right to appear in the status of one defending himself.

... Even when he insists that he is not waiving his *Faretta* rights, a *pro se* defendant's solicitation of or acquiescence in certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably.

. . . .

*Faretta* does not require a trial judge to permit "hybrid" representation.... [I]f a defendant is given the opportunity and elects to have counsel appear before the court or jury, his complaints concerning counsel's subsequent unsolicited participation lose much of their force. A defendant does not have a constitutional right to choreograph special appearances by counsel. Once a *pro se* defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and

unambiguously renews his request that standby counsel be silenced.

*Id.* at 182–83, 104 S.Ct. at 953.

In the present case, we conclude that Mills's *Faretta* rights were not violated. Preliminarily, we note that unlike many cases involving standby counsel for *pro se* defendants, here standby counsel was appointed at the behest of Mills, not over his objection. Further, he does not contend on this appeal that his standby counsel took any action that was not authorized by Mills or adopted any strategy or position that was not initiated by Mills. Rather, Mills argues that the court violated his right to proceed *pro se* principally by discharging Bradford, whom he calls his original standby counsel, curtailing his communication with Lavine, whom he labels "substitute" standby counsel, and excluding him from making legal arguments and attending side-bar conferences. We are unpersuaded.

■ First, the suggestion that the court dismissed Mills's first "standby" counsel does not accurately reflect the record. Bradford had never been designated standby counsel. When Mills moved for permission to proceed *pro se,* Bradford was properly dismissed as his attorney of record. Though Mills asked to have Bradford appointed as standby counsel, the court denied the request. We confess that we do not see a sound basis for the court's denial of that request. It was endorsed by the government, and Bradford was familiar with the case, having represented Mills for five months. The rationale could not have been the fact that if Bradford, a Legal Aid attorney, were appointed, Mills's standby counsel would be supported by public funds; the court eventually appointed an attorney under the Criminal Justice Act, whose efforts, including the time necessary to familiarize himself with the case, would likewise be compensated out of public funds. Further, the admonition to Bradford to "stay away" from Mills and not even to speak with him seems harsh. The court did not explain these decisions on the record, and they seem to us arbitrary and undesirable.

Nonetheless, just as Mills would not have been entitled to appointed counsel of his own choosing, *see, e.g., Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); *see also Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *United States v. Scopo*, 861 F.2d 339, 344 (2d Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1957, 104 L.Ed.2d 426 (1989); *United States v. Cicale*, 691 F.2d 95, 106–07 (2d Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983), he was not entitled to the appointment of a standby of his own choosing, *see United States v. Campbell*, 874 F.2d 838, 848–49 (1st Cir.1989). It was within the discretion of the court to appoint someone other than Bradford.

■ Mills's second complaint, *i.e.,* that the court restricted his consultation with Lavine, is not fairly supported by the record. Mills relies heavily on the proposition that "the court warned standby counsel, 'No effective assistance from counsel, none' ....". (Mills brief on appeal at 26.) Taken in context, however, the court's words do not appear to have been a direction or a "warning" but merely an observation responsive to Lavine's wish to put on the record that Lavine was acting only as an "advisor" to a defendant who was conducting his own trial. Indeed, the court repeatedly instructed Lavine to inform Mills of specific strictures. Lavine's statements to the court that Lavine was not responsible for Mills's strategy and his reminders that he was not in fact Mills's attorney do not reveal any denial of Mills's rights, given Mills's election to proceed *pro se.*

■ Mills's complaint that he should have been allowed to make legal arguments and attend side-bar conferences has some merit and presents a closer question. At the suppression hearing, when Lavine indicated that Mills wished to present the closing argument, the court should have honored that request. It did not, suggesting that Mills was "represented by a lawyer" and therefore could not himself argue. Standby counsel does not, however, "represent" the *pro se* defendant, and the court

erred in not permitting Mills to make his own legal argument. We do not, however, view this as a basis for reversal. Though the court denied the motion to suppress, the government did not introduce the unsuppressed statements at trial; and since the error occurred at a pretrial hearing, the jury was unaware of it. In the context of the case as a whole, this refusal to allow Mills to make the closing statement at the suppression hearing was not a substantial incursion into his right to control his own defense.

Nor are we persuaded that the court's exclusion of Mills from side-bar conferences at trial requires reversal. Though Mills claims that he was excluded from all such conferences, the record does not support this assertion. The transcript of the second and third trial days indicates that Mills attended and spoke at two side-bar conferences. The latter transcript indicates that a third side bar was requested by Mills himself. Though Mills's appellate counsel asserts that the transcript is mistaken, she was not present at the trial and has not presented any affidavit from Mills or from trial counsel to support her assertion.

Even if the transcript is in error, however, in attributing these statements to Mills (and we note that a few other portions of the transcript make attributions that are plainly mistaken, given the substance of what follows), we are not persuaded that there was a substantial violation of Mills's *Faretta* rights. Until near the end of the third day of trial, there apparently was no way of knowing that Mills did not acquiesce in having Lavine alone represent him at side-bar conferences. Until that point there is no indication in the record that he asked to be present, nor any indication that he objected to being excluded.

■ Though an argument could be made that by acquiescing for nearly half the trial, Mills waived his right to be present at side-bar conferences for the remainder of the trial, we think that is not the better view here. There is no indication that Mills attempted to "choreograph special appear-

ances" by Lavine; rather, after having voluntarily remained away from the side bars for a period, he unambiguously requested that he be allowed to attend such conferences. In the circumstances, especially in light of the fact that virtually all of the other aspects of the trial were being conducted by Mills himself, we are of the view that once Mills stated that he wished to attend the side bars and objected to being excluded, the court should have allowed him to attend.

■ Nonetheless, in the context of the trial as a whole, we cannot conclude that Mills's *Faretta* rights were violated, for we see no indication that Mills did not control and guide his defense and only a minuscule risk that the jury did not perceive Mills's control. Just as the court had no way of knowing for several days that Mills wished to be present at side-bar conferences, the jury had no way of so knowing. Moreover, the court's exclusion of Mills from the September 15 side bar regarding scheduling was not within the hearing of the jury; nor was the jury present when, on the following trial day, Lavine objected on Mills's behalf. Thus, from all that occurred within the hearing of the jury, Mills was indeed, throughout the trial, conducting every aspect of his defense that he chose to conduct. Mills made the opening statement; he cross-examined the government's witnesses; he examined his own witnesses; notwithstanding the transcript's quotation of the court as stating to Mills "[y]ou" cannot make objections, which appears to be either a slip of the tongue or an error in transcription, Mills himself made most of whatever defense objections were made to the government's questions; and Mills made his own closing argument.

Further, it appears that whenever legal arguments were made by Lavine when the jury was not in the courtroom, Mills was present. Lavine at all stages informed the court that he was pursuing a line of defense fashioned by Mills himself, and nothing in the record contradicts that representation. Nor, as discussed above, is there any support in the record for Mills's argument that the trial court prohibited Lavine

from communicating with Mills with regard to the substance of what occurred at the side bars.

In all the circumstances, we cannot say that Mills did not, both in fact and in the perception of the jury, have a fair chance to present his case in his own way.

B. *The Treatment of the Witness Kelly*

■ Mills also contends that his right to conduct his own defense was impeded by the court's treatment of his key witness, Kelly. Kelly had pleaded guilty before Judge Costantino in October 1987 to conspiracy to transfer and use counterfeit money, and in his plea allocution he had identified Mills as a coconspirator. At Mills's trial, however, Kelly testified that Mills had had no role in the counterfeiting and that he had, under duress from the Secret Service, framed an innocent man (Mills).

Though the court, *inter alia,* warned that any deviation by Kelly from his plea allocution would expose him to the risk of resentencing or of prosecution for perjury, remanded Kelly to custody during a three-day recess, and questioned him closely as to his prior plea and his awareness that he was named as a defendant in three counts of the present indictment, the challenged conduct has no particular relevance to whether the defense was being conducted by counsel or by Mills *pro se.* The court's treatment of Kelly bears more on whether Mills had a fair trial, and we consider the court's conduct in that light.

The court's attitude toward Kelly was openly skeptical. The court questioned Kelly extensively in the presence of the jury as to his awareness that he was named as a defendant in several counts of the indictment (notwithstanding his having pleaded guilty to one count in satisfaction of all). It questioned him as to whether he had consulted his attorney before deciding to give his testimony exonerating Mills. During Mills's questioning of Kelly, the court cross-examined Kelly on his statement that Mills was not involved:

Q  [by Mills] Mr. Kelly, do you know where you got the counterfeit money from?

A  Yes, I do.

Q  And would you tell the Court where you got the counterfeit money from?

A  I got the counterfeit money from Vincent Conzo. . . .

Q  Aside from Mr. Conzo, was anybody else involved in those activities?

A  Yes, there was.

Q  Would you tell the jury who they were?

A  A guy by the name of Dennis O'[K]eefe, another guy Joseph, but I forgot his last name.  These are just different parties that I gave money to.

Q  Did Mr. Mills have anything to do with those activities?

A  No.

THE COURT:  Which activities are they?

MR. MILLS:  The counterfeit activities.

THE COURT:  Do you understand that question?  What activities are you talking about, what dates?

THE WITNESS:  The way I understood it, your Honor, the activities giving the other two parties that I just mentioned counterfeit money.

THE COURT:  About the activities, was anybody else involved in any of the activities that you had?

THE WITNESS:  Yes.  I stated two names.

THE COURT:  Who else was involved in these activities?

THE WITNESS:  The two names that I mentioned, and Vincent Conzo.

THE COURT:  Was anybody else?

THE WITNESS:  No, your Honor.

THE COURT:  Nobody else was involved in activities with you?

THE WITNESS:  Yes, your Honor.

THE COURT:  You never had involvement with anybody else with counterfeit money, other than these people?

THE WITNESS:  Not that I can recall, your Honor.

(September 15, 1988 Trial Tr. at 246–47.)

At the end of this interrogation, Lavine promptly asked for a side bar, which was refused.  The court instead recessed for lunch.  Following the lunch break, Lavine asked the court to advise the jury that the court's questions did not indicate that the court was predisposed either to believe or to disbelieve the witness's testimony.  The court refused:

MR. LAVINE:  Judge, before the jury comes in, I am going to ask you to consider advising the jury that just because you ask a question of a witness, doesn't mean that you have any judgment or predisposition one way or other with respect to the manner in which the witness is speaking.

MR. GINSBERG:  We have no objection to that.

MR. GLEESON [AUSA]:  No objection, your Honor.

THE COURT:  Why don't you ask me if I have an objection?  I do.  I didn't do it that way at all.  No, I won't tell them that.  They only have to consider the answer.

(*Id.* at 248.)

In the following session, the court also required Kelly to repeat several times his testimony that the Secret Service had pressured him to accuse Mills:

Q  [by Mills] Would you tell the Court and the jury under what circumstances you came to this Court for this case?

A  I came here to let everybody know about the truth in this case and so that somebody else wouldn't be railroaded like I was railroaded.

THE COURT:  You were what, what did you say?

THE WITNESS:  Railroaded.

THE COURT:  Say it loudly so the jury can hear you?

THE WITNESS:  Yes, sir.

THE COURT:  Say it loudly.

THE WITNESS:  I said that I came here to speak the truth so nobody would be railroaded like I was railroaded.

THE COURT:  I see, all right.  The jury heard that, now.

(September 19, 1988 Trial Tr. at 46–47.)

A defendant has a right to a trial at which the presiding judge has no actual or

apparent bias, *see generally Daye v. Attorney General*, 696 F.2d 186, 196–97 (2d Cir. 1982) (en banc), one conducted with evenhanded fairness for the defendant, *see, e.g., Daye v. Attorney General*, 712 F.2d 1566, 1570–72 (2d Cir.1983), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984); *United States v. Fernandez*, 480 F.2d 726, 735–38 (2d Cir.1973). This does not mean that we will reverse simply because a trial was not error-free. *See Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir.1985), *rehearing denied*, 787 F.2d 71 (2d Cir.1986).

We have reviewed the trial record and have evaluated the court's treatment of Kelly in light of all the circumstances, including Kelly's testimony that he had lied to the court under oath in the proceedings surrounding his plea of guilty. While it would have been preferable for the court to have preserved a more impartial tone, we conclude that the court's intervention was limited and that these limited occurrences do not warrant the granting of a new trial.

In sum, though we are troubled by some of the court's statements, we cannot conclude that they denied Mills either the right to conduct his defense or his right to a fair trial.

## C. *Admissibility of Mills's 1982 Arrest and Conviction*

Mills contends that the trial court erred in allowing the government to present evidence of Mills's 1982 arrest and conviction for counterfeiting. This contention lacks merit, for these events were admissible as proof of intent and identity. *See* Fed.R. Evid. 404(b).

■ Under Rule 404(b), relevant evidence of "other crimes, wrongs, or acts" may be admitted at trial to show that a defendant who claims that his conduct had an innocent explanation had the intent to commit the offense. *See United States v. Caputo*, 808 F.2d 963, 968 (2d Cir.1987); *see also Huddleston v. United States*, 485 U.S. 681, 687–88, 108 S.Ct. 1496, 1500–01, 99 L.Ed.2d 771 (1988) (such evidence should be excluded if trial court finds, under Fed.

R.Evid. 403, that its potential for unfair prejudice substantially outweighs its probative value).

Further, even where intent is not in issue, Rule 404(b) permits evidence of similar acts to prove a "signature crime," *i.e.*, a *modus operandi* where the crimes are "so nearly identical in method as to ear-mark them as the handiwork of the accused." 2 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 404[16], at 404–127 (1985) (quoting *McCormick on Evidence*, § 157 (1954)); *see United States v. Sliker*, 751 F.2d 477, 486–87 (2d Cir.1984) (Friendly, *J.*), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832, 471 U.S. 1137, 105 S.Ct. 2679, 86 L.Ed.2d 697 (1985); *United States v. Danzey*, 594 F.2d 905, 911 (2d Cir.), *cert. denied*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979). Such evidence may be admitted to show that a defendant was in fact the perpetrator of the conduct at issue.

■ In the present case, either of these theories justified admission of Mills's 1982 arrest and conviction. Mills raised the issue of intent in his opening to the jury. He stated that he was in the business of importing sweaters, not making counterfeit money, and that

> [t]he Government is trying to say that I openly received counterfeit money from a guy who just put it under my arm and said, thanks for the counterfeit money. I will prove that not only did I receive a package in send [*sic:* innocently?] not knowing its contents, but I was never told what the contents was. It could have been sweaters, only the package was too small.

(September 13, 1988 Trial Tr. at 30.) Plainly, Mills created an issue as to his intent in accepting the bag of counterfeit bills, and the government was entitled to rebut, even in its case-in-chief, by showing that on a past occasion Mills had intentionally engaged in counterfeiting activity.

■ In addition, though the court instructed the jury that it could consider the 1982 evidence only in determining Mills's intent, it would have been permissible to allow the jury to consider it as refuting Mills's argument that he was not in fact

the counterfeiter and had been "set up" by Kelly. In order to show that it was in fact Mills who had made the counterfeit bills, the government was entitled to show that the process used to make the bills at issue here was a unique one, that it had been encountered only once before in the experience of the Secret Service, and that on that prior occasion the perpetrator was Mills.

### D. *Other Contentions*

Mills makes a variety of other arguments that he was treated unfairly, which we conclude are without merit. They do not warrant discussion except to note that some of those that at first blush appear to be the most serious, in fact misrepresent the record. For example, Mills states that

> the prosecutor on voir dire asked Kelly if the checks' endorsement by "John Kelly" was Kelly's own signature.... When Kelly answered "no", the court scolded the appellant, "These are forgeries. Listen, this case is becoming a circus. Try this case now. I have had enough" ...,

(Mills brief on appeal at 30), complaining that

> [t]he court was not shy about questioning Kelly's testimony *in the jury's presence, falsely accusing the appellant of introducing forged documents into evidence* ...,

(*id.* at 50; emphasis added). In fact, however, the transcript reveals that the court characterized the signatures as "forgeries" only at a side-bar conference. We see no indication that any such language was used within the hearing of the jury.

Mills also argues he was improperly sentenced, stating, *inter alia,* that

> [d]uring his brief sentencing statement, the appellant stated that the court had not respected his constitutional rights. The court interrupted him and stated, "You don't have any...."

(*Id.* at 36.) In fact, the record indicates that the statement "You don't have any" was a comment that Mills had no respect for the court. The sentencing transcript reads as follows:

> THE WITNESS [Mills]: Further causing a total disregard for any my [*sic*] rights

to a fair trial. With all due respect to this Court—

THE COURT: You don't have any....

(November 18, 1988 Sentencing Tr. at 11.)

In sum, we conclude that Mills's most serious accusations have substantially overstated the record.

### CONCLUSION

For the foregoing reasons, the judgment of conviction is affirmed.