UNITED STATES of America, Appellee,

v.

Juma SAMPSON, Defendant–Appellant.

Docket No. 03–1124.

United States Court of Appeals, Second Circuit.

Argued: Jan. 8, 2004.

Decided: Sept. 28, 2004.

Peter J. Pullano, Rochester, NY, for Defendant–Appellant.

Bret Puschek, Assistant United States Attorney for the Western District of New York (Bradley E. Tyler and Frank H. Sherman, Assistant United States Attorneys, of counsel; Michael A. Battle, United States Attorney, on the brief), Rochester, NY, for Appellee.

Before: WINTER, JACOBS, and STRAUB, Circuit Judges.

JACOBS and STRAUB, Circuit JJ.

Defendant–Appellant Juma Sampson ("Sampson") appeals from the February 26, 2003 judgment of the United States District Court for the Western District of New York (David G. Larimer, *Judge*), convicting him, following a jury trial, of the following five counts: [i] possessing with intent to distribute five grams or more of a substance containing cocaine base in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B); [ii] possessing marijuana in violation of 21 U.S.C. § 844(a); [iii] distributing fifty grams or more of a substance containing cocaine base in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A); [iv] possessing a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c) and § 2; and [v] possessing with intent to distribute five grams or more of a substance containing cocaine base in violation of 21 U.S.C. § 841(a)(1), § 841(b)(1)(B), and 18 U.S.C. § 2. The indictment alleged that counts one and two occurred on or about October 9, 1998 ("1998 counts"), and that counts three, four, and five occurred on or about June 21, 2000 ("2000 counts"). Sampson was sentenced to twenty years' imprisonment for counts one, three, and five, and to two years' imprisonment for count two to be served concurrently. In addition, Sampson was sentenced to five years' imprisonment for count four, to be served consecutively to the sentence for counts one, two, three, and five.

In a summary order filed today, we resolve this appeal with respect to all but two of Sampson's arguments, concluding that they are without merit. In this opinion, we address Sampson's remaining arguments: (1) that his convictions on all counts should be vacated because the district court erred in denying his motion to sever the 1998 counts from the 2000 counts; and (2) that the district court

erred in concluding that Sampson's New York youthful offender adjudication was "a prior conviction for a felony drug offense [that] has become final" within the meaning of 21 U.S.C. § 841(b)(1)(A) and therefore subjecting him to a twenty-year mandatory minimum sentence on count three. We agree with Sampson that the district court should have severed the 1998 counts from the 2000 counts, but we conclude that only the 1998 convictions should be vacated as Sampson has demonstrated substantial prejudice only as to those counts. We reject Sampson's claim that his youthful offender adjudication should not have subjected him to an enhanced penalty under 21 U.S.C. § 841(b)(1)(A).

## BACKGROUND

On July 11, 2000, the government filed an indictment charging that Sampson committed drug offenses and a firearm offense in June 2000. On August 21, 2001, over a year after the original indictment was filed, the government filed a third superseding indictment,[1] which added two counts charging Sampson with committing drug offenses in October 1998. The third superseding indictment charged Sampson with the following five counts:

Count One: On or about October 9, 1998, possessing with intent to distribute five grams or more of a substance containing cocaine base in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B).

Count Two: On or about October 9, 1998, possessing marijuana in violation of 21 U.S.C. § 844(a).

Count Three: On or about June 21, 2000, distributing fifty grams or more of a substance containing cocaine base

in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A).

Count Four: On or about June 21, 2000, possessing a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c) and § 2.

Count Five: On or about June 21, 2000, possessing with intent to distribute five grams or more of a substance containing cocaine base in violation of 21 U.S.C. § 841(a)(1), § 841(b)(1)(B), and 18 U.S.C. § 2.

On September 26, 2001, after further counts were added, Sampson moved to sever counts one and two from counts three, four, and five. Sampson argued that the 1998 counts were improperly joined with the 2000 counts under Federal Rule of Criminal Procedure 8(a), and, in the alternative, that even if the counts had been properly joined, they should be severed under Federal Rule of Criminal Procedure 14(a). On November 21, 2001, Magistrate Judge William G. Bauer, to whom all pretrial motions had been referred, denied on both grounds Sampson's motion to sever the 1998 counts from the 2000 counts.

Sampson filed objections to the magistrate judge's decision, arguing that the joinder of the 1998 counts with the 2000 counts placed him in an "untenable position" as he "would have to forgo giving testimony in his defense" on the 1998 counts in order to preserve his right to remain silent on the 2000 counts. Sampson claimed that although he had previously thought he would take the stand to prove an entrapment defense as to count three, he no longer planned to do so because the defense had been "unable to locate and speak to the confidential informant ... that was used by the police to target Mr. Sampson." Without corrobo-

---

**1.** This indictment was mislabeled "second superseding indictment" when it was filed. It was amended to read "third superseding indictment" on September 26, 2001.

rating evidence from the informant to support his entrapment defense, Sampson said that he did not want to testify about the 2000 counts. In addition, Sampson noted that the magistrate judge had ruled that the government would be unable to use a statement given by Sampson while in custody in June 2000 unless he took the stand.[2] Sampson argued that in light of these circumstances, and the nature of the government's proof on the 2000 counts—including a videotape of a transaction between Sampson and an undercover officer that Sampson anticipated the government would use to prove count three—he wanted to remain silent as to those counts. Sampson argued, however, that he wanted to testify about the 1998 counts, and he pointed to an affidavit which provided the specific testimony he wanted to give regarding the incident giving rise to those counts.

In the affidavit, Sampson said that at the time of his arrest on October 9, 1998 he had just left a friend's house on Depew Street in Rochester, New York, which was near the street where he was arrested. According to Sampson, another friend saw him leave the house, but that friend had since died. Sampson said that after he was arrested, an officer showed him a yellow jacket and drugs that the officer said he found inside the jacket. Sampson denied that the yellow jacket or the drugs were his. Sampson's affidavit controverted the claim by another officer that he had chased Sampson from a store.

On January 4, 2002, the district court affirmed the magistrate judge's denial of Sampson's motion for severance, concluding that "defendant has failed to establish the requisite particularized showing that must be made concerning the testimony he wishes to give on Counts I and II and his reasons for remaining silent on the other counts."

The six-day trial commenced on July 12, 2002. Sampson was tried along with a co-defendant, Patricia Larkins. Sampson did not take the stand in his defense.

The government's chief witness on the 1998 counts was Officer Stephen Ward. Ward testified that as he was driving at around 4:00 p.m. on October 9, 1998, he observed in front of a store on Chili Avenue in Rochester, New York, two men making a hand-to-hand exchange that he believed might have been a drug transaction. Ward identified Sampson at trial as one of the men that he saw in front of the store. Ward said that Sampson was wearing a yellow leather New York Yankees jacket, and baggy, dark colored pants that Ward thought were blue jeans. Ward said that as he got out of his car and began to approach the men, Sampson dropped something on the ground and began running away. Ward did not pick up the item, but he said that it appeared to be a small bag of a green leafy substance, which he suspected was marijuana. According to Ward, he ran after Sampson but lost sight of him as Sampson was running toward Garfield Street. As Ward began the foot chase, he radioed a description of Sampson to other officers. Ward "vaguely" recalled that he described the suspect as "a black male wearing a yellow leather Yankees coat with blue or black jeans on." According to Ward, a minute or two after he lost sight of Sampson he learned from other officers that Sampson had been caught.

---

2. The statements at issue were at worst mildly incriminating. The police report containing the statements says that when police took Sampson into an interview room after his arrest on June 21, 2000, he told officers "not to bother, he has nothing to say and he doesn't want to cooperate." According to the report, Sampson said also that "he would rather do his time and that he wanted to call his lawyer."

Ward said that when he arrived at the scene, Sampson was not wearing a yellow leather jacket. Ward identified Sampson as the man he had chased. Another officer showed Ward a yellow jacket, which Ward identified as the jacket he had seen Sampson wearing. Ward testified that he returned to the area where the chase began, but he was unable to find the item that Sampson had dropped.

Officer Mike Nicholls also testified about Sampson's arrest on October 9, 1998. Nicholls said he was with Officer Aaron Springer in a patrol car when he heard the broadcast from Ward, describing the suspect as a black male with baggy blue jeans and a yellow jacket. Nicholls said that he and Springer went to the area of the chase, and as they were heading up Garfield Street, he saw a person wearing baggy blue jeans but not a yellow jacket. Nicholls identified Sampson at trial as the man he saw on Garfield Street. Nicholls said that he stopped Sampson, and Ward arrived at the scene and identified him as the man he had chased. According to Nicholls, when he first saw Sampson, Sampson was coming out of a driveway on Garfield Street. After Sampson was placed in the police car, Nicholls went to the driveway to look for the yellow jacket. He found the jacket in a garbage can in the backyard, and inside the pockets he found substances later established to be marijuana and cocaine. Nicholls said that he also found a cell phone in the jacket. Nicholls confirmed that Ward identified the jacket as the one that Sampson had been wearing. Officer Springer's testimony confirmed that Nicholls went into the backyard of a house on Garfield Street and came out with a yellow jacket, which contained substances appearing to be cocaine and marijuana. Springer said that Sampson did not run from the officers as they approached him on Garfield Street, and Springer did not recall seeing Sampson out of breath or perspiring when he was arrested.

No other evidence linking Sampson to the yellow jacket or to the drugs, such as fingerprint analysis or evidence connecting Sampson to the cell phone found in the jacket, was introduced at trial.

The defense argued at trial that Sampson had been misidentified and was not the man wearing the yellow jacket that Ward had chased.

In support of count three, which alleged that Sampson had distributed fifty grams or more of a substance containing cocaine base on or about June 21, 2000, the government provided the testimony of John Fiorica, an undercover officer. Fiorica testified that on June 21, 2000, he purchased approximately two ounces of crack cocaine from Sampson. (Later testimony established that the drugs weighed sixty-one grams and contained cocaine base.) The transaction was captured on videotape, which the government showed at trial. The theory of defense on count three appeared to be that Sampson did not actually hand any drugs to Fiorica, but rather was trying to "con" him and simply take the money.

Counts four and five were based on a search of an apartment at 22 Weldon Street in Rochester, New York, on June 21, 2000. The apartment contained a living room and three bedrooms. Testimony established that during the course of the search, officers found on one table in the east bedroom a quantity of crack cocaine and a loaded .380 caliber handgun. Also in the east bedroom, officers found a measuring cup containing a white/yellow rock-like substance which appeared to be crack cocaine residue; a live round of ammunition; glass and styrofoam plates containing a white/yellow rock-like substance; a razor blade; some unused clear small plastic

ziplock bags; and a triple-beam scale. Officers found a live round of ammunition on the living room table and a starter pistol on a night stand in the master bedroom.

The apartment at 22 Weldon Street was leased to Patricia Larkins. Sampson's mother testified that Larkins lived there with Larkins' and Sampson's infant son, Juma Sampson, Jr. Although the lease of the apartment at 22 Weldon Street was in Larkins' name only, several pieces of evidence connected Sampson to the apartment. The landlord of 22 Weldon Street testified that during the time period from November 1999 until June 2000, when the apartment was leased to Larkins, Sampson was at the apartment whenever the landlord went to visit. The landlord said that Sampson generally paid the rent. Officer Fiorica testified that he had met Sampson outside 22 Weldon Street on several occasions, and when Sampson was arrested, he had a key to the apartment. Finally, inside the apartment, officers found a phone bill addressed to 22 Weldon Street, showing Sampson as the subscriber.

Sampson's defense on counts four and five was that he did not live at 22 Weldon Street, and therefore was not responsible for the apartment's contents. Sampson's mother testified that Sampson lived with her at 10 Weldon Street, which was several houses down from 22 Weldon Street. Sampson's mother also testified that Kevin Brown—who Fiorica admitted was the informant used by the police in arranging the exchange between Fiorica and Sampson—was living with Larkins in the apartment at 22 Weldon Street.

In its closing argument, the government encouraged the jury to consider the evidence relating to the 2000 offenses in determining Sampson's guilt of the 1998 offenses, and vice versa. In particular, the government argued that it had proved intent to distribute with respect to count one

because "we know, based on his later conduct, that Juma Sampson is a drug dealer." In addition, the government argued that with regard to count five, the government had proved knowing possession of the drugs because "we know based on the incident in 1998 . . . that Juma Sampson is a drug dealer." After the government's closing remarks, Sampson moved for a mistrial on the ground that the government had made improper propensity arguments when it linked the 1998 offenses with the 2000 offenses. Sampson argued that "one of the concerns obviously in the initial severance motion was specifically this type of conduct on the part of the prosecutor." The motion for a mistrial was denied, and the jury convicted Sampson of all counts.

Prior to trial, the government had filed an information pursuant to 21 U.S.C. § 851, specifying 1994 state-court offenses that might subject Sampson to increased punishment: criminal sale of a controlled substance in the third degree and criminal possession of a controlled substance in the third degree. But before the state court sentenced Sampson for these offenses (to an indeterminate term of one to three years' imprisonment), the court adjudicated him a youthful offender, thus requiring it to "direct that the[se] conviction[s] be deemed vacated and replaced by a youthful offender finding." N.Y.Crim. Proc. Law ("CPL") § 720.20(3).

At sentencing below, the district court found that Sampson's 1994 state convictions—notwithstanding that they were "replaced by a youthful offender finding," *id.*—triggered a twenty-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A) for count three (i.e., one of the 2000 drug offenses). In so doing, the court adopted the PSR recommendation, as the government urged, and it rejected Sampson's challenge to reliance on the

youthful offender adjudication to enhance the sentence. The court therefore sentenced Sampson to twenty years' imprisonment for counts one, three, and five, and to two years' imprisonment for count two (to run concurrently); and five years' imprisonment for count four (to run consecutively).

## DISCUSSION

### I. Severance

Sampson argues on appeal that the district court erred in denying his motion to sever the 1998 counts from the 2000 counts pursuant to Federal Rule of Criminal Procedure 14(a). According to Sampson, the 1998 counts were added simply to show propensity and label him as "a career drug dealer." Sampson argues that the joinder of the 1998 counts and the 2000 counts caused him great prejudice because he wanted to testify regarding the 1998 counts but remain silent on the 2000 counts.

Although Sampson argued below that the counts were improperly joined under Federal Rule of Criminal Procedure 8(a),[3] he does not pursue that argument on appeal. Rather, he argues only that the counts should have been severed under Rule 14(a).[4] Therefore, we do not consider whether the counts were properly joined under Rule 8(a).

■ "Even though distinct offenses have been properly joined under Rule 8, the court may order separate trials or grant a severance under Rule 14 if it appears that the defendant is prejudiced by the joinder." *United States v. Werner,* 620 F.2d 922, 928 (2d Cir.1980). However, "[i]n order to prevail, the defendant must show not simply some prejudice but *substantial* prejudice." *Id.* We have explained that "[g]ranting separate trials under Rule 14 simply on a showing of some adverse effect, particularly solely the adverse effect of being tried for two crimes rather than one, would reject the balance struck in Rule 8(a), since this type of 'prejudice' will exist in any Rule 8(a) case." *Id.* at 929; *see also United States v. Amato,* 15 F.3d 230, 237 (2d Cir.1994) ("Given the balance struck by Rule 8, which 'authorizes some prejudice' against the defendant, a defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in 'substantial prejudice.' "). The denial of a motion to sever under Rule 14 is reviewed for abuse of discretion and "will not be overturned unless the defendant demonstrates that the failure to sever caused him 'substantial prejudice' in the form of a 'miscarriage of justice.' " *United States v. Blakney,* 941 F.2d 114, 116 (2d Cir.1991) (quoting *United States v. Potamitis,* 739 F.2d 784, 790 (2d Cir.), *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984)).

■ We conclude that the joint trial of the 1998 counts with the 2000 counts caused Sampson substantial prejudice with regard to the 1998 counts. Courts have

---

**3.** Federal Rule of Criminal Procedure 8(a) provides:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged— whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed.R.Crim.P. 8(a).

**4.** Federal Rule of Criminal Procedure 14(a) provides: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed.R.Crim.P. 14(a).

recognized that "[p]rejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence." *Cross v. United States,* 335 F.2d 987, 989 (D.C.Cir.1964). The D.C. Circuit explained in *Baker v. United States,* 401 F.2d 958 (D.C.Cir.1968), the potential for prejudice:

> [B]ecause of the unfavorable appearance of testifying on one charge while remaining silent on another, and the consequent pressure to testify as to all or none, the defendant may be confronted with a dilemma: whether, by remaining silent, to lose the benefit of vital testimony on one count, rather than risk the prejudice (as to either or both counts) that would result from testifying on the other.

*Id.* at 976.

We stated in *United States v. Werner,* however, that "a mere unexplicated assertion" of the desire to testify on only one count is not enough to require severance. *Werner,* 620 F.2d at 930. In *Werner,* we pointed to the D.C. Circuit's statements in *Baker* that " 'no need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other.' " *Id.* at 930 (quoting *Baker,* 401 F.2d at 977). The court in *Baker* said further:

> In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of "economy and expedition in judicial administration" against the defendant's interest in having a free choice with respect to testifying.

*Baker,* 401 F.2d at 977 (footnote omitted); *see also United States ex rel. Tarallo v. LaVallee,* 433 F.2d 4, 6 (2d Cir.1970) ("Moreover, in order for a defendant to be granted a severance, he must make a 'convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other.' ") (quoting *Baker,* 401 F.2d at 977), *cert. denied,* 403 U.S. 919, 91 S.Ct. 2235, 29 L.Ed.2d 697 (1971).[5]

Sampson asserts that had the district court severed the 1998 counts from the 2000 counts, he would have taken the stand in his defense on the 1998 counts. Specifically, Sampson argues that he would have testified that: (1) just before he was arrested on October 9, 1998, he was visiting a friend who lived nearby; (2) another friend saw him there, but that witness died and could not testify; and (3) neither the yellow jacket found in a backyard nor the drugs found in the pockets of the jacket were his. Sampson argues also that he had strong reasons for remaining silent with respect to the 2000 counts. Sampson informed the district court that he did not want to testify regarding the 2000 counts because he anticipated that the government, in order to prove count three, would show a videotape of Sampson's transaction with the undercover officer on June 21, 2000; he did not think he could pursue an entrapment defense on count three without the corroborating testimony of the informant who could not be located; and the magistrate judge had ruled that the gov-

---

5. Other circuits have applied this standard or a similar standard to determine whether a severance motion should have been granted. *See, e.g., United States v. Jordan,* 112 F.3d 14, 16–17 (1st Cir.), *cert. denied,* 522 U.S. 923, 118 S.Ct. 318, 139 L.Ed.2d 245 (1997); *United States v. Ballis,* 28 F.3d 1399, 1408–09 (5th Cir.1994).

ernment could not use a statement given by Sampson while in custody in June 2000 unless he took the stand.

Thus, this case plainly differs from *Werner*, where we observed that the defendant "gave no explanation whatever as to what his testimony would be with respect to the 1978 robbery or why he could not have given such testimony at a joint trial." *Werner*, 620 F.2d at 930. In addition, in *Werner*, we found the defendant's claim of prejudice from a joint trial unconvincing because "evidence of the 1976 crime would have been admissible at a trial on the 1978 robbery whether [the defendant] testified at the latter or not." *Id.* at 930. Here, unlike in *Werner*, evidence relating to the 2000 counts almost certainly would not have been admitted at a separate trial on the 1998 counts—if Sampson gave the testimony he asserts he wanted to give.

The government attempts to argue that evidence relating to the 2000 acts would be admissible at a separate trial on the 1998 counts. The government asserts that "[i]t was apparent that it would be the defendant's defense as to Counts One and Two, the hand-to-hand drug transaction/foot chase of October 9, 1998, that he was not the individual wearing the yellow leather jacket which contained the drugs." Thus, according to the government, Sampson "would be putting his identity and intent into issue as to those counts, thereby permitting proof as to those issues" and Sampson's "subsequent involvement in the events charged in Counts Three through Five would therefore be probative of those issues."

■ The government is incorrect. First, the evidence relating to the 2000 counts would not be admissible to prove identity on the 1998 counts. Federal Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b).[6] For the evidence relating to Sampson's involvement in the 2000 offenses to be probative of whether he committed the 1998 offenses, a juror would have to reason that the events in 2000 showed that Sampson was a drug dealer, and because he was a drug dealer it is more likely that he was the man wearing the yellow jacket containing drugs that was chased by Officer Ward in 1998. This sort of propensity reasoning is plainly barred by Federal Rule of Evidence 404(b). *See United States v. Edwards*, 342 F.3d 168, 177–78 (2d Cir.2003).[7]

**6.** Rule 404(b) provides in full:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.
Fed.R.Evid. 404(b).

**7.** "Other-crime evidence may be admitted if the evidence of other crimes is so distinctive that it can be seen as a 'signature' identifying a unique defendant, such as the infamous Jack the Ripper." 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 404.22[5][c], at 404–121 (Joseph M. McLaughlin ed., 2d ed.2004); *see also United States v. Mills*, 895 F.2d 897, 907 (2d Cir.) ("'[E]ven where intent is not in issue, Rule 404(b) permits evidence of similar acts to prove a 'signature crime,' *i.e.*, a *modus operandi* where the crimes are 'so nearly identical in method as to ear-mark them as the handiwork of the accused.'"), *cert. denied*, 495 U.S. 951, 110 S.Ct. 2216, 109 L.Ed.2d 541 (1990). However, in the present case, there is no claim that the perpetrator of the 1998 offenses and the 2000 offenses used a distinctive *modus operandi*. Therefore, the 2000 offenses

Second, the government is incorrect in its assertion that Sampson's defense that he was misidentified in 1998 put his intent at issue on the 1998 counts. We stated in *United States v. Ortiz*, 857 F.2d 900 (2d Cir.1988), *cert. denied*, 489 U.S. 1070, 109 S.Ct. 1352, 103 L.Ed.2d 820 (1989), that "intent is not placed in issue by a defense that the defendant did not do the charged act at all" and concluded that "[w]hen a defendant unequivocally relies on such a defense, evidence of other acts is not admissible for the purpose of proving intent." *Id.* at 904; *see also United States v. Colon*, 880 F.2d 650, 656–57 (2d Cir. 1989). We said in *Ortiz*:

> [A] defendant may completely forestall the admission of other act evidence on the issue of intent by 'express[ing] a decision not to dispute that issue with sufficient clarity that the trial court will be justified (a) in sustaining objection to any subsequent cross-examination or jury argument that seeks to raise the issue and (b) in charging the jury that if they find all the other elements established beyond a reasonable doubt, they can resolve the issue against the defendant because it is not disputed.'

*Ortiz*, 857 F.2d at 903–04 (quoting *United States v. Figueroa*, 618 F.2d 934, 942 (2d Cir.1980)) (alterations in original). Thus, at a separate trial on the 1998 counts, Sampson could have ensured that evidence of the 2000 acts would not be admitted for the purpose of proving intent to commit the 1998 acts by stipulating to intent and challenging only identity—which was the linchpin of his defense on counts one and two. *See Ortiz*, 857 F.2d at 903–04; *United States v. Mohel*, 604 F.2d 748, 752–54 (2d Cir.1979); *United States v. Manafza-deh*, 592 F.2d 81, 86–87 (2d Cir.1979). Had the district court severed the counts, it is very likely that Sampson would have made such a stipulation at a trial on the 1998 counts in order to keep out the 2000 evidence.

In sum, Sampson has made a particularized showing concerning the testimony he would have given at a trial on the 1998 counts had the court granted the severance motion and his reasons for wanting to remain silent on the 2000 counts. The government has failed to identify any permissible basis for introducing evidence relating to the 2000 counts at a separate trial on the 1998 counts, had Sampson given the testimony he wanted to give. The prejudice Sampson suffered as to the 1998 counts at the joint trial was exacerbated by the government's closing statements, in which it encouraged the jury to use evidence relating to the 2000 counts in considering Sampson's guilt of the 1998 counts. In addition, the government's evidence in support of the 1998 counts was relatively weak. The connection between Sampson and the drugs rested on one officer's identification of Sampson as the man he had chased, and of the yellow jacket containing drugs as the jacket that Sampson had been wearing when he was chased. Had Sampson testified, he says he would have denied that he was the man chased by Ward. That testimony might have created reasonable doubt. Based on all of these circumstances, we conclude that Sampson has suffered substantial prejudice and that denial of the severance motion was an abuse of discretion. Therefore, we vacate his convictions on those counts.

could not be admitted at a trial on the 1998 offenses to prove identity. *See Weinstein's Federal Evidence* § 404.22[5][c], at 404–122 ("Other-crimes evidence is not permissible to identify a defendant as the perpetrator of the charged act simply because he or she has at other times committed the same garden variety criminal act, since this would be identification based on the forbidden inference of propensity.").

However, we affirm Sampson's convictions on the 2000 counts. Sampson chose to remain silent at trial, which is what he asserts he would have done at a separate trial on the 2000 counts. Therefore, unlike with the 1998 counts, his ability to put on a defense was not substantially affected by the joint trial. In addition, the evidence of Sampson's guilt on the 2000 counts was overwhelming. The drug sale giving rise to count three was captured on a videotape, which was played for the jury at trial. Counts four and five were supported by photographs and the testimony of several officers about the drugs and gun found at 22 Weldon Street, as well as substantial evidence connecting Sampson to the apartment. Therefore, we affirm the 2000 convictions, as Sampson has failed to demonstrate that trying him jointly for the 2000 counts and the 1998 counts substantially prejudiced him with respect to the 2000 counts.

## II. Sampson's Mandatory Minimum Sentence

■ Sampson argues that the district court improperly enhanced his mandatory minimum sentence on count three based on previous New York State felony drug convictions that were "replaced by a youthful offender finding." CPL § 720.20(3); see id. § 720.20 (establishing the procedures for a youthful offender determination); id. § 720.35 (prescribing the consequences, under state law, of a youthful offender adjudication); see also United States v. Cuello, 357 F.3d 162, 165–67 (2d Cir.2004) (analyzing New York's youthful offender regime); United States v. Matthews, 205 F.3d 544, 546–48 (2d Cir.2000) (same). We review this determination de novo. See, e.g., United States v. Berg, 250 F.3d 139, 142 (2d Cir.2001).

■ The question is whether a prior conviction of a "felony drug offense" qualifies as "final" under 21 U.S.C. § 841(b), notwithstanding that it was "replaced by a youthful offender finding." CPL § 720.20(3). A "felony drug offense" is "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, or depressant or stimulant substances." 21 U.S.C. § 802(44). "[A] prior conviction is *final* for purposes of recidivist sentencing when all avenues of direct appellate review have been exhausted." *United States v. Lovell,* 16 F.3d 494, 497 (2d Cir.1994) (emphasis added).

Under the state procedure, Sampson was convicted of felony drug offenses, but (based on a finding by the sentencing court) his convictions were "deemed vacated and replaced by a youthful offender finding," CPL § 720.20(3). To say that the convictions were *deemed* vacated is to say that they were not vacated in fact, *id.,* but rather the "[y]outhful offender finding" was "substituted for the conviction[s]," *id.* § 720.10(4). In doing so, New York law indulged Sampson by an adjudication of leniency. *See People v. Dunbar,* 71 A.D.2d 805, 806, 419 N.Y.S.2d 356, 357–58 (N.Y.App.Div.1979) ("The grant of youthful offender (Y.O.) treatment is a matter of privilege, not of right."). *But see* CPL § 720.20(1)(b) (noting limited circumstances—not present in this case—in which a youthful offender finding is mandatory).

Even where a defendant is adjudicated a youthful offender, post-judgment motions and appeals are permissible "wherever [the relevant] provisions can reasonably be so applied." CPL § 720.30; *see, e.g., People v. Nudelman,* 70 A.D.2d 13, 16, 419 N.Y.S.2d 674, 676 (N.Y.App.Div.1979) ("It is well settled that a trial court's exercise of discretion in affording youthful offender

treatment is reviewable on appeal."); *see also* CPL §§ 440.10–.60 (post-judgment motions), 450.10–.90 (appeals). The record in this case does not indicate whether Sampson elected to appeal his youthful offender finding or the corresponding sentence; but it is clear enough that Sampson no longer has any avenue for directly appealing the prior felony convictions upon which the youthful offender finding and the prison sentence were based.

In sum, as a result of the criminal conduct underlying Sampson's youthful offender adjudication, he was [i] tried and convicted [ii] in an adult court [iii] of adult drug "offense[s] ... [iv] punishable by imprisonment for more than one year," 21 U.S.C. § 802(44); [v] he served his sentence in an adult institution; and [vi] no avenue for direct appeal exists. Accordingly, the district court properly determined that Sampson's New York youthful offender adjudication qualifies as a prior final conviction under Section 841(b)(1).[8]

Reaching the same conclusion, the Eleventh Circuit reasoned that a youthful offender statute is "meant to provide a second chance, not a 'technical legal advantage if, not having learned a lesson, [individuals] continue their criminal conduct.'" *United States v. Acosta,* 287 F.3d 1034, 1037 (11th Cir.2002). As the *Acosta* court observed, "the purpose of section 841(b)(1)(B), 'to punish and deter recidivism,' would be frustrated if recidivist offenders were excused from enhanced sentencing merely because their prior offenses are not deemed 'convictions' under state law." *Id.* (citation omitted).

 True, "New York courts do not use youthful offender adjudications as

predicates for enhanced sentencing ...." *Matthews,* 205 F.3d at 548 (internal citation omitted). But this "does not restrict federal courts from taking them into account when imposing sentences under the Guidelines where ... youthful offender adjudications are permitted to be used in various other ways both inside and outside the State of New York," *id.,* including at sentencing, *id.* at 548 n. 4. "The language and design of [the New York] statute, as well as its purpose, compel [the] conclusion" that "an adjudication under the New York youthful offender statute does not result in an 'expunged' conviction for purposes of the Guidelines." *Id.* at 546. The New York statute "does not require actions that would effectively eliminate all vestiges of the adjudication" and instead "requires that records concerning the adjudication ... are retained and, in certain circumstances, used for subsequent purposes." *Id.* at 547.

Our holding is consistent with how we previously have construed the relevant New York law in cases involving the calculation of criminal history and offense level under the Guidelines. *See Cuello,* 357 F.3d at 165–69; *United States v. Reinoso,* 350 F.3d 51, 54–56 (2d Cir.2003); *United States v. Driskell,* 277 F.3d 150, 152–58 (2d Cir.2002); *Matthews,* 205 F.3d at 546–49.

We therefore affirm the district court's ruling that Sampson is subject to a twenty-year mandatory minimum sentence.

## CONCLUSION

For the reasons stated in this opinion and in the summary order published this date, the judgment is affirmed in part and in part vacated, and the case is remanded

---

8. We have no reason to consider whether other juvenile adjudications, such as juvenile delinquency findings (entered in family court), could qualify as final felony convictions under Section 841(b).

for further proceedings consistent with this opinion.