**In re DUKE ENERGY CORP. SECURITIES LITIGATION**

**No. 02 CIV. 3960(JSR).**

United States District Court, S.D. New York.

Sept. 17, 2003.

Robert A. Wallner, Clifford S. Goodstein, Christian P. Siebott, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, Andrew Entwistle, Stephen D. Oestreich, Robert N. Cappucci, Entwistle & Cappucci LLP, New York, NY, Brian Murray, Eric Belfi, Rabin & Peckel LLP, New York, NY, Deborah R. Gross, Law Offices Bernard M. Gross, P.C., Philadelphia, PA, for Plaintiffs.

Howard Schiffman, Dickstein Shapiro Morin & Oshinsky, LLP, Washington, DC, Robert Serio, Gibson, Dunn & Crutcher LLP, New York, NY, for Defendants.

*MEMORANDUM ORDER*

RAKOFF, District Judge.

Plaintiffs brought this securities class action on behalf of individuals who had purchased stock in Duke Energy Corporation ("Duke Energy" or the "Company") between July 22, 1999 and August 2, 2002. The Amended Consolidated Class Action Complaint ("Complaint") alleges that Duke Energy, together with its individual officers, Morgan Stanley & Company Incorporated, and Merrill Lynch, Pierce, Fenner & Smith Incorporated, artificially inflated the price of the Company's stock throughout this period and failed to disclose the inflations to the purchasers constituting the plaintiff class. Defendants moved to dismiss the Complaint for failure to state a claim, *see* Fed.R.Civ.P. 12(b)(6), and for failure to plead the allegations of fraud to the levels required by Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b)(2).

On December 30, 2002, the Court issued a summary Order granting defendants' motion in all respects but deferring the entry of judgment until this Memorandum Order issued stating the reasons for that ruling. Subsequently, Chief Judge Graham C. Mullen issued an Order in the related case of *In re Duke Energy ERISA Litigation*, 3:02 Civ. 291 MU (W.D.N.C. June 26, 2003), dismissing that case with prejudice for some of the same reasons that had led this Court to dismiss the instant action. Accordingly, this Memorandum Order will only briefly elaborate some of the primary reasons for the Court's prior ruling.

The pertinent allegations of the Complaint, taken as true for purposes of defendants' motion, are as follows:

On March 15, 2001, Duke Energy made two public offerings of its stock, and, in connection therewith, filed with the United States Securities and Exchange Commission ("SEC") documents that, *inter alia*, incorporated the Company's consolidated financial statements and made representations about its consolidated revenues for the years 1999 and 2000. On November 15, 2001, the Company made a third public offering and again filed similar documents with the SEC. Additionally, from 1999 to early 2002, Duke Energy filed quarterly Forms 10–Q with the SEC in which it represented that the consolidated financial statements "reflect all normal recurring adjustments that are, in the opinion of management, necessary to present fairly the financial position and results of operations for the respective periods." Complaint ¶¶ 51, 5, 63, 67, 71, 86, 90, 93, 98, 103. The positive financial position reflected in these filings was also echoed in statements made throughout this period by the Company's President and Chief Executive Officer. *See, e.g.*, Complaint ¶ 98.

In May 2002, the Company uncovered facts suggesting that some of its traders had engaged in "round trip" or "wash" transactions, involving simultaneous sales and purchases of energy ("sell/buy-back trades") at the same prices and in the same amounts, in a manner that would tend to artificially inflate the Company's revenues. On May 17, 2002, Duke Energy announced that it had "analyzed its trades for the three-year period from 1999 through 2001 to identify those trades which may have some of the characteristics of sell/buy-back trades." Complaint § 106 (quoting Duke Energy Press Release dated May 17, 2002). Three days later, *Bloomberg News* quoted defendant Richard Osborne, then Chief Risk Officer for Duke Energy, as saying: "We've come up with about $1.1 billion in trades that could have the characteristics of 'wash' trades, but all but $125 million don't appear to be." *Id.* Sometime following these

disclosures (the exact dates are not alleged), the price of Duke Energy's common stock fell by $1.18 per share.

On May 21, 2002, the Federal Energy Regulatory Commission launched an inquiry into round-trip trading in the western United States power markets. Beginning on or about May 22, 2002, Duke Energy issued a number of press releases in which it reported varying estimates of the number of round-trip trades in which the Company had engaged. Following some (but not all) of these disclosures, the price of Duke Energy's shares again fell. Finally, on August 1, 2002, Duke Energy issued a press release formally confirming that the Company had engaged in $217 million in round-trip transactions.

Plaintiffs allege that between the time of the first public offering and the time of the last press release, Duke Energy failed adequately to disclose that its revenues had been overstated as a result of the round-trip trades and that this failure, as well as related failures to disclose insufficient internal accounting controls and improper "mark-to-market" accounting practices, violated Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l & 77o, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5.

■ As to the accounting controls, however, the Complaint does not allege any affirmative misrepresentations. In the absence of such an affirmative misrepresentation, allegations of "garden-variety mismanagement, such as managers failing to . . . adequately inform themselves" do not state a claim under federal securities laws. *Field v. Trump,* 850 F.2d 938, 948 (2d Cir.1988) (internal quotation marks omitted); *see also Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 639–40 (3d Cir. 1989).

■ Similarly, the Complaint does not specify any respect in which defendants' mark-to-market accounting practices (which plaintiffs concede were disclosed to the public) were improper, or the manner in which the alleged accounting deficiencies inflated the Company's assets. While the Court must take as true all well-pleaded facts, conclusory allegations must be disregarded. *See In re Razorfish, Inc. Sec. Litig.,* No. 00 Civ. 9474, 2001 WL 1111502, at *2 n. 1 (S.D.N.Y. Sept.21, 2001). The failure therefore—in an amended consolidated complaint, no less—to allege in any cognizable respect whatever how the mark-to-market accounting practices were improper, let alone fraudulent, or how the internal accounting controls were fraudulently misrepresented, is fatal to those claims.

■ The remaining (and core) allegations, concerning inflation of revenues, suffer from a different defect: they fail to state a *material* misrepresentation or concealment. To prove a violation of the federal securities laws, plaintiffs must show that there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (internal quotation marks omitted). Stripped of rhetorical hyperbole, the Complaint alleges that Duke Energy undertook, at most, $217 million in round-trip trades over the course of two years (2001 and 2002).[1] The

---

1. The hyperbole consists, *inter alia,* of the claim that the trading represented over $1 billion in inflated revenues. *See* Complaint ¶¶ 29, 106. But the sole alleged factual basis for this claim is defendant Osborne's aforementioned statement that "[w]e've come up with about $1.1 billion in trades that could have the characteristics of 'wash' trades, but

undisputed portions of the Company's financial statements referenced in the Complaint establish that an inflation of $217 million in the Company's revenues for the relevant period amounts to about 0.3% of Duke Energy's total revenues for that period—an immaterial percentage as a matter of law. *See In re Duke Energy ERISA Litig.*, 3:02 Civ. 291–MU (June 26, 2003) (finding this same alleged inflation of revenues immaterial as a matter of law for purposes of breach of fiduciary duty claim); *see also, e.g., Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546–47 (8th Cir. 1997) (alleged overstatement of assets by 2% was immaterial as a matter of law); *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 & n. 26 (1st Cir.1996) (dismissal appropriate where omitted information was only 3% to 9% of actual revenues and thus immaterial as a matter of law); *In re Convergent Techs. Second Half 1984 Sec. Litig.*, No. C–85–20130–SW, 1990 WL 606271, at *10 (N.D.Cal. Jan.10, 1990) (transactions amounting to $1.2 million, which accounted for only 1½% of revenue, were immaterial as a matter of law).

Plaintiffs argue that, nonetheless, the failure to disclose the round-trip trading was material "in context," *see Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162–64 (2d Cir.2000), as shown, allegedly, by the fact that the share price fell at various times after the overstatements were disclosed. But plaintiffs' allegations in this respect are far too vague, frequently failing to indicate, for example, how much time elapsed between a given disclosure and a given drop in the price of the stock, or how long the alleged decline lasted. *See, e.g.,* Complaint ¶¶ 108, 118, 120, 126.

Thus, there is no adequate basis for attributing the declines to the disclosures.

Moreover, bare allegations of stock price declines cannot cure the immateriality of an overstatement as small as the one here at issue. *See, e.g., United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir.1991) ("whether a public company's stock price moves up or down or stays the same ... does not establish the materiality of statements made"); *see also Parnes*, 122 F.3d at 546–47 (overstatement of assets by less than 2% was immaterial despite 50% drop in stock price); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 715 (3d Cir.1996)(1.2% overstatement of total assets not material, despite alleged 60% drop in stock price).

The same is also true of plaintiffs' final argument, that the nondisclosure was qualitatively material because what was concealed was "illegal" activity. Plaintiffs are vague about what constituted this underlying "illegality," as "wash sales" and "round-trip trading" are not necessarily illegal *per se*. But even assuming they were, illegality of a financial nature (as opposed, say, to rape or murder) must still be assessed, for disclosure purposes, by its economic impact. Otherwise, every time a giant corporation failed to disclose a petty theft in its mailroom, it would be liable under the securities laws. *See, e.g., TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)(noting dangers of having too low a materiality standard). The failure to disclose improper round-trip trading or accounting practices, even if such trading or practices are arguably illegal, does not give rise to a securities claim if their only effect in terms of what was disclosed to the

---

all but $125 million don't appear to be." Complaint ¶ 106; *see also* transcript, 11/13/2002, at 34–39. The fact that Duke Energy, upon further investigation, subsequently increased the figure for wash trades

to $217 million does not provide any reasonable basis for inferring that the entire $1.1 billion were wash trades. Consequently, the claim of $1.1 billion is inadequately pleaded and must be disregarded.

public was a minuscule 0.3% inflation of revenues.

Accordingly, the Court hereby reconfirms its Order of December 30, 2002 dismissing the Complaint with prejudice, and directs the Clerk of the Court to enter judgment in favor of the defendants.

SO ORDERED.