**UNITED STATES of America,**

v.

**Ronald E. FERGUSON, Christopher P. Garand, Robert D. Graham, Christian M. Milton, and Elizabeth A. Monrad.**

**Criminal No. 3:06CR137 (CFD).**

United States District Court,
D. Connecticut.

May 15, 2008.

Clifford H. Schoenberg, Douglas I. Koff, Cadwalader, Wickersham & Taft LLP, Alan M. Vinegrad, Douglas B. Bloom, Olivia A. Radin, Pamela A. Carter, Covington & Burling LLP, Frederick P. Hafetz, Michael S. Chernis, Susan R. Necheles, Tracy E. Sivitz, Hafetz & Necheles, Richard L. Spinogatti, Proskauer Rose, Robert J. Cleary, New York, NY, James K. Robinson, Michael E. Horowitz, Cadwalader Wickersham & Taft, LLP, Hope Ivy Hamilton, Covington & Burling, LLP, Peter H. White, Mayer Brown LLP, Brian M. Heberlig, Bruce C. Bishop, David M. Fragale, Eduardo L. Crosa, Erik L. Kitchen, Reid H. Weingarten, Steptoe & Johnson, Thomas Abbenante, Washington, DC, Jonathan E. Rich, Proskauer Rose LLP, William F. Dow, III, Jacobs, Grudberg, Belt, Dow & Katz, P.C., Richard A. Reeve, George Gust Kouros, Sheehan & Reeve, Jonathan J. Einhorn, New Haven, CT, Anthony Pacheco, Keith L. Butler, Proskauer Rose LLP, Los Angeles, CA, Richard R. Brown, Brown, Paindiris & Scott, Hartford, CT, for Defendants.

Eric J. Glover, Henry K. Kopel, U.S. Attorney's Office, New Haven, CT, Paul E. Pelletier, Adam G. Safwat, Fraud-DC, U.S. Department of Justice, Washington, DC, Raymond E. Patricco, U.S. Attorney's Office, Alexandria, VA, for Plaintiffs.

### RULING ON DEFENDANTS' MOTIONS PURSUANT TO FED. R. CRIM. P. 29 AND 33 AND DEFENDANTS' MOTIONS TO SEVER

CHRISTOPHER F. DRONEY, District Judge.

The Superseding Indictment in this case charged defendants Ferguson, Graham, Milton, and Monrad with one count of conspiracy, seven counts of securities fraud, five counts of making false statements to the U.S. Securities and Exchange Commission ("SEC"), and three counts of mail fraud; defendant Garand was charged with one count of conspiracy, three counts of securities fraud, three counts of making false statements to the SEC, and three counts of mail fraud. The charges stemmed from a fraudulent reinsurance contract between American International Group, Inc. ("AIG") and General Reinsurance Corp. ("Gen Re"). At trial, after the close of the government's case and again at the close of all the evidence, the defendants moved for a judgment of acquittal under Fed.R.Crim.P. 29(a) ("Rule 29"), or, in the alternative, for a severance under Fed.R.Crim.P. 14 ("Rule 14"). The Court reserved judgment on these motions pursuant to Rule 29(b). The jury subsequently returned a verdict convicting all five defendants of every offense with which he or she was charged. The defendants did not make additional post-verdict motions for a judgment of acquittal pursuant to Rule 29(c), but rather moved the Court for a new trial under Fed.R.Crim.P. 33(a) ("Rule 33") if the Court were to grant their Rule 29(a) motions as to any of the counts of conviction. The Court now addresses the defendants' Rule 29(a), Rule 14, and Rule 33 motions.

### I. Background

The defendants were convicted of crimes associated with a loss portfolio transfer

("LPT") reinsurance transaction between Gen Re and AIG. Four of the defendants—Ferguson, Garand, Graham, and Monrad—are former Gen Re executives; the remaining defendant, Milton, is a former AIG executive. Count One charged all five of the defendants with participating in a conspiracy to commit securities fraud, to make and cause to be made false and misleading statements in reports filed with the SEC, to falsify and cause to be falsified the books and records of a public company, and to commit mail fraud, in violation of 18 U.S.C. § 371.

Counts Two through Five and Eight through Ten charged defendants Ferguson, Graham, Milton, and Monrad with securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff. Counts Eight through Ten also charged defendant Garand with securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff.

Counts Six and Seven and Eleven through Thirteen charged defendants Ferguson, Graham, Milton, and Monrad with making and causing to be made false and misleading statements with the SEC, in violation of 15 U.S.C. §§ 78m(a) & 78ff. Counts Eleven through Thirteen also charged defendant Garand with making and causing to be made false and misleading statements with the SEC, in violation of 15 U.S.C. §§ 78m(a) & 78ff.

Counts Fourteen through Sixteen charged all five defendants with mail fraud, in violation of 18 U.S.C. § 2461.

## II. Rule 29(a) Motions

### A. Standard of Review

"[A] defendant challenging his verdict on sufficiency grounds bears a heavy burden." *United States v. Lewter,* 402 F.3d 319, 321 (2d Cir.2005) (internal quotation marks omitted). When faced with a Rule 29 motion, the question for the Court is "whether, after viewing the evidence in the light most favorable to the prosecution, any ra-

tional trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In answering this question, the evidence must be considered "in its totality, not in isolation, and the Government need not negate every theory of innocence." *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000). The Court must view the evidence presented in the light most favorable to the Government and draw all reasonable inferences in the Government's favor. *Id.* Circumstantial evidence alone may be sufficient to sustain a conviction. *United States v. Wexler,* 522 F.3d 194, 206–207 (2d Cir. 2008).

In considering the sufficiency of the evidence presented at trial to prove the charged crimes, "the Court must be careful to avoid usurping the role of the jury," and accordingly "may not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury." *Autuori,* 212 F.3d at 114 (citation and internal quotation marks omitted). Rather, the Court must "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Pimentel,* 346 F.3d 285, 295 (2d Cir.2003) (citation and internal quotation marks omitted). Ultimately, the Court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Autuori,* 212 F.3d at 114 (quoting *United States v. Mariani,* 725 F.2d 862, 865 (2d Cir.1984)). If the Court concludes that either a verdict of guilty or not guilty was possible based on the evidence, it must uphold the jury's guilty verdict. *Id.* Put another way, the

Court may "not disturb a conviction on grounds of legal insufficiency of the evidence at trial if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Pimentel,* 346 F.3d at 295 (internal quotation marks and citations omitted); *see United States v. Morgan,* 385 F.3d 196, 204 (2d Cir.2004) ("In cases of conspiracy, deference to the jury's findings 'is especially important ... because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" (internal quotation marks omitted)).

### B. Evidence at Trial [1]

The Indictment charged the defendants with structuring and carrying out a fraudulent, no-risk reinsurance contract between Gen Re and AIG in order to falsely boost AIG's publicly reported loss reserves. Viewing the evidence in the light most favorable to the government, and drawing all inferences favor of the jury's verdict, the government established the following facts at trial concerning the transaction at issue in this case.[2]

On October 26, 2000, AIG publicly announced that its loss reserves had decreased by $59 million for the third quarter of 2000. Gov. Ex. 1. Several days later, AIG's CEO, Maurice "Hank" Greenberg ("Greenberg"), contacted defendant Ferguson, then the CEO of Gen Re, seeking a deal through which AIG could obtain up to $500 million of loss reserves. Gov. Ex. 6, 8; Trial Transcript 649–652, 655–658 (Napier testimony) [hereinafter "Tr."]. The defendants and other co-conspirators structured a deal, undertaken through two contracts, through which AIG appeared to reinsure Gen Re. Gov. Ex. 23, 31, 171, 184; Tr. 2143–45 (Houldsworth testimony). Specifically, over the course of the two effectuating contracts, the deal appeared to provide for AIG to reinsure Gen Re for up to $600 million in limit of liability in exchange for $500 million of premiums.[3] Gov. Ex. 171, 184; Tr. 814–15 (Napier testimony); Tr. 2144 (Houldsworth testimony). The loss reserves associated with the underlying insurance contracts ostensibly ceded from Gen Re to AIG totaled $500 million. Gov. Ex. 171, 184. AIG appeared to take on $100 million in risk through the deal; in fact, however, there was no risk transferred to AIG.[4] Tr. 2256,

---

1. A significant portion of the government's evidence at trial consisted of taped telephone conversations between the defendants and their co-conspirators talking about the transaction as they structured it and carried it out. John Houldsworth, a co-conspirator who cooperated with the government, explained in his trial testimony that the tapes were created because of a telephone line taping policy in his office in effect at the time of the transaction. Trial Transcript 2170–73 [hereinafter "Tr."]. The system automatically created tapes of all telephone conversations to or from his office telephone. *Id.* At the time of the transaction Houldsworth believed that the tapes would be periodically reused and taped over, but several years later he learned that, in fact, all of the recordings had been preserved. Tr. 2172–73. The government obtained copies of the tapes in the course of its investigation.

2. The following facts are those pertinent to the Court's resolution of these motions, not an exhaustive list of the facts established at trial. Additional facts established at trial are noted where necessary for the Court's discussion of these motions.

3. Gen Re and AIG entered into both written contracts through subsidiary companies. Cologne Reinsurance Co. Dublin ("CRD") served as the nominal party to the deal for Gen Re, and National Union Fire Insurance Co. ("NUFIC") served as the nominal party for AIG.

4. The defendants and their co-conspirators reinforced the appearance of a legitimate reinsurance transaction by creating a fake offer letter through which Gen Re falsely appeared to solicit the deal from AIG. Gov. Ex. 62, 62A, 64; Tr. 2372–73 (Houldsworth testimony:

2284, 2292–93. Regardless, AIG booked the deal as reinsurance, and, accordingly, its subsequent financial statements reflected an increase of $250 million in loss reserves for the fourth quarter of 2000 and an additional $250 million increase in loss reserves for the first quarter of 2001. Gov. Ex. 146, 163, 250. The LPT itself had no financial benefit to Gen Re, but, through a separate, secret side deal, AIG paid Gen Re $5 million to undertake the transaction and repaid Gen Re for the $10 million in premium it paid under the written contracts. Tr. 775–77 (Napier testimony); Tr. 2144–45, 2253–56 (Houldsworth testimony). The defendants and their co-conspirators disguised this $15 million payment through a series of seemingly unrelated transactions between subsidiaries of Gen Re and AIG. Tr. 3831–59 (Postal Inspector Tendick testimony explaining series of contracts and wire transfers used to distribute premium and fee back to Gen Re).

According to the testimony of two insurance stock analysts described more fully below, the amount of an insurance company's loss reserves, especially when viewed in conjunction with the amount of its premiums, provides investors with evidence of the company's financial health; if premiums increase during a period where loss reserves decrease, the insurance company could be under-reserved to pay for claims on its policies, which would impact future earnings. Tr. 406–11 (Schroeder testimony); Tr. 3549–50 (Cohen testimony). The

"Q: Was that paper trail that you were planning to prepare going to be true or false? A: It was going to be false. Q: And in what way? A: Well, it was going to make it appear that we were offering them the contract, whereas in fact they'd actually asked for it."), 2377–84 (Houldsworth testimony discussing content of fake offer letter). In fact, however, Greenberg initiated the transaction through his October 31, 2000 telephone call to Fergu-

government presented evidence at trial that AIG pursued the no-risk reinsurance deal with Gen Re to artificially inflate AIG's loss reserves to quell industry analysts' concerns that the company's loss reserves were declining during a period of premium growth. Gov. Ex. 8 ("Chris [Milton] confirmed that this [transaction] is to address the criticism [AIG] received from the analysts."), 18, 18A; Tr. 2139 (Houldsworth testimony) ("She [Monrad] said [the transaction] was to appease some analysts who had concerns over AIG's third quarter [2000] numbers."); Tr. 2179–80 (Houldsworth testimony). The Gen Re/AIG deal enabled AIG to publicly report an increase in loss reserves of $106 million in the fourth quarter of 2000 and $62 million in the first quarter of 2001. Gov. Ex. 250; Tr. 306–08 (Hamrah testimony). In these two financial reporting quarters, AIG would have reported decreases in its loss reserves during periods of premium growth if not for the deal. Gov. Ex. 250; Tr. 279–80, 294, 306–08 (Hamrah testimony). AIG continued to include the $500 million of additional reserves ostensibly obtained through the deal in its required SEC financial statements until AIG restated its financial statements in May, 2005, several months after AIG received notice that the SEC and the New York Attorney General's Office were investigating the transaction. Gov. Ex. 243, 250.

### C. Materiality of Charged Misstatements

Defendants Ferguson and Garand[5] as-

son. Gov. Ex. 6, 8; Tr. 649–652, 655–658 (Napier testimony).

5. Although at trial each defendant orally moved under Rule 29(a) for a judgment of acquittal, only defendant Ferguson submitted a written motion under Rule 29(a) that argued for an acquittal based upon this particular issue, and only defendant Garand joined that written motion. Because of this, the Court's discussion focuses on Ferguson's ar-

sert that there is insufficient evidence to sustain their convictions for securities fraud, false statements to the SEC, and mail fraud because no rational jury could have found AIG's misstatements about its loss reserves to be material. The government argues that the trial record contains ample evidence upon which a rational jury could have found the misstatements to be material. For the reasons below, the Court agrees with the government.

### 1. Legal Standard for Materiality

■ To support convictions of securities fraud, false statements to the SEC, and mail fraud, the jury must have found beyond a reasonable doubt that AIG's misstatements about its loss reserves constituted misstatements of *material* facts. 15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. §§ 240.10b–5 & 240.12b–20; 18 U.S.C. § 1341. In this context, material facts are those "that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000) (citing *Basic v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). More specifically, "there must be a substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231–32, 108 S.Ct. 978 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). This does not mean, however, that materiality hinges on proof that investors "would have acted differently if an accurate disclosure was made." *Ganino*, 228 F.3d at 162 (citing *Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1533–34 (2d Cir.1991)). The Supreme Court has cautioned that there is no bright-line test for materiality. *Basic*, 485 U.S. at 236, 108 S.Ct. 978 ("Any

approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive."). Instead, "whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case." *Ganino*, 228 F.3d at 162.

■ The absence of a bright-line test for materiality requires the Court to consider the charged misstatements in context. Although quantitative indicators of a misstatement's significance to investors could be determinative of materiality, "[w]ith respect to financial statements, . . . '[q]ualitative factors may cause misstatements of quantitatively small amounts to be material.'" *Id.* at 163 (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45152 (1999)); *see United States v. Forbes*, No. 02–CR–264, 2007 WL 141952, at *8 (D.Conn. Jan. 17, 2007), *aff'd* 249 Fed.Appx. 233, 236–37 (2d Cir.2007) (permitting evidence of $14 billion of losses to shareholders as evidence of materiality). The Second Circuit has noted that the SEC Staff Accounting Bulleting No. 99 ("SAB No. 99") identifies a non-exhaustive list of qualitative factors relevant to assessing materiality, including: (1) whether the misstatement conceals a change in earnings or other trends; (2) "whether the misstatement hides a failure to meet analysts' consensus expectations;" and (3) "whether the misstatement changes a loss into income or vice versa." SAB No. 99, 64 Fed.Reg. at 45152; *see Ganino*, 228 F.3d at 163 ("SAB No. 99 is thoroughly reasoned and consistent with existing law—its non-exhaustive list of factors is simply an application of the well-established *Basic* analysis to misrepresentations of financial results—we find it persuasive

guments, but, in light of the other defendants' silence on this issue, the Court also applies its

conclusions here in sustaining the other defendants' convictions.

guidance for evaluating the materiality of an alleged misrepresentation."). Additionally, SAB No. 99 observes that "[a]mong other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material," and that "[w]hile the intent of management does not render a misstatement material, it may provide significant evidence of materiality." 64 Fed. Reg. at 45152. Case law supports the use of these additional factors as evidence of materiality. *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir.1991) ("stock movement is a factor the jury may consider relevant" to materiality, although not itself determinative); *see Gebhardt v. Con-Agra Foods, Inc.*, 335 F.3d 824, 829–30 (8th Cir.2003) (recognizing management's role in misstatements as part of the total mix of information that "would probably be important to investors").

## 2. Discussion

The Court concludes that there was sufficient evidence at trial for a rational jury to find that AIG's misstatements about its loss reserves were material. Ferguson argues that the LPT had a minimal quantitative effect on AIG's financial statements, so any misstatements about the amount of AIG's loss reserves were immaterial as a matter of law. Although the Court recognizes that the $500 million of loss reserves at issue in this case could be quantitatively insignificant when viewed in the larger context of AIG's overall business, the Court rejects Ferguson's argument in light of controlling case law that emphasizes using qualitative considerations to assess materiality.[6] *Ganino*, 228 F.3d at 163; *see Basic*, 485 U.S. at 236, 108 S.Ct. 978 (rejecting "any approach that designates a single fact or occurrence as always determinative of . . . materiality"). As explained below, the evidence at trial relevant to these qualitative considerations more than adequately supports the jury's finding that, in context, AIG's misstatements about its loss reserves were material.[7]

At trial, several witnesses testified about the importance AIG's investors

**6.** Ferguson's papers in support of this motion presented several quantitative comparisons between the $500 million of loss reserves derived from the LPT and AIG's net loss reserves and total liabilities, which totaled, respectively, in the tens and hundreds of billions of dollars between 2000 and 2005. Ferguson argues that this evidence conclusively shows the LPT's quantitatively immaterial effect on AIG's net reserves and total liabilities. Even assuming, however, that these comparisons accurately portray the true impact of the LPT on AIG's net reserves and total liabilities, trial testimony explained that the $500 million of artificially inflated reserves would have reduced earnings per share should AIG ever have had to take a charge to earnings to pay for claims purportedly covered by the phony reserves. *See, e.g.,* Tr. 630 (Schroeder testimony). Accordingly, although the Court's ruling on materiality rests primarily on the evidence at trial of qualitative factors as outlined in *Ganino*, the Court also notes that a rational jury could have credited the evidence of the LPT's

potential quantitative effect on earnings in finding that AIG's misstatements about its loss reserves were material.

**7.** Although Ferguson cites several decisions in which courts dismissed claims on the basis of quantitative immateriality, most of those courts recognized that context is relevant to materiality. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir.1997); *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 (1st Cir.1996); *In re Westinghouse Secs. Litig.*, 90 F.3d 696, 714 n. 14 (3d Cir.1996) ("[W]e . . . reject defendants' similarly categorical assertion that materiality must be quantified at a specified percentage of income or assets. . . . [T]he question of materiality must be considered on a case-by-case basis."); *In re Duke Energy Corp. Secs. Litig.*, 282 F.Supp.2d 158, 161 (S.D.N.Y.2003) (dismissing quantitatively immaterial claim where no allegations of qualitative materiality); *see Ganino*, 228 F.3d at 164 (discussing *Parnes* and *Glassman* ). To the extent that other courts have assessed materiality under a bright-line quantitative

placed upon the amount of the company's loss reserves, changes in the amount of its loss reserves, and the effect of declining loss reserves on earnings, all of which are qualitative factors weighing in favor of the misstatements' materiality.[8] Charlene Hamrah, the head of Investor Relations at AIG,[9] testified that as part of her job she frequently discussed loss reserves with insurance industry analysts, and that analysts were generally very interested in trends relating to loss reserves. Tr. 255, 264. Analysts "liked" and expected to see trends in loss reserves that matched trends in premiums. Tr. 257. Hamrah testified that analysts focused on AIG's announced decrease in loss reserves of $59 million for the third quarter of 2000, but that when AIG announced an increase in loss reserves for the following quarter—the effect of the first artificial inflation of AIG's loss reserves by $250 million attributable to the LPT—analysts no longer expressed concerns to her about

loss reserves. Tr. 253–54, 297. If AIG had accurately reported its loss reserves for the fourth quarter of 2000 and the first quarter of 2001, AIG would have reported declines, not gains, in its loss reserves for those two quarters in addition to the decline in loss reserves that AIG accurately reported for the third quarter of 2000. Tr. 306–09. Hamrah believes that analysts and investors would have considered this information important in assessing the financial health of the company and in making investment decisions. Tr. 309–10. From this testimony the jury could infer that accurate information about the amount of AIG's loss reserves is significant to its investors, especially where growth in premiums is not matched by a corresponding increase in loss reserves.[10]

■■■ The testimony of two prominent insurance industry analysts, Alice Schroeder[11] and Jay Cohen,[12] further explained the significance to investors of accurate

test, the Second Circuit has rejected this approach. *Ganino,* 228 F.3d at 164.

8. As mentioned above, the Court will not discuss all of the relevant evidence presented in five weeks of testimony, but will instead focus on the evidence most significant to the Court's analysis of this issue.

9. Hamrah described her primary responsibility in this position to be serving as the "liaison between the company and the investment community," meaning "individual investors who own AIG stock," institutional investors, "as well as research analysts that do research on the company and make a recommendation to their clients with respect to buying or selling or holding the [company's] stock." Tr. 186–87.

10. Ferguson argues that the nature of loss reserves as an estimate, rather than a precise calculation, weighs against the materiality of AIG's misstatements. *See* SAB No. 99, 64 Fed.Reg. at 45152 ("Another factor in materiality judgments is the degree of precision that is attainable in estimating the judgment item.

The amount of deviation that is considered immaterial may increase as the attainable degree of precision decreases."). While the Court agrees that the evidence at trial explained loss reserves to be an insurance company's best estimate of expected future losses, this fact does not negate the evidence that investors and industry analysts would have considered intentionally concealed information about negative trends in loss reserves to be significant, nor does it establish that the amount by which AIG intentionally misstated its reserves was unimportant to them. *See* Tr. 257–58, 309–10 (Hamrah testimony); Tr. 406–11, 417–20 (Schroeder testimony); Tr. 3549–51, 3630–31 (Cohen testimony).

11. At the time of the LPT Schroeder was a managing director at Morgan Stanley and was among the top ranked property and casualty insurance industry analysts. Tr. 382–83. The team she led regularly advised institutional investors about AIG. Tr. 377, 409.

12. At the time of the LPT Cohen was a senior equity analyst at Merrill Lynch focusing on property and casualty insurance companies,

information about loss reserves, and why investors would have found AIG's misstatements to be important. Both testified that loss reserves are an important indicator of an insurance company's financial health, and, accordingly, that loss reserves are important to analysts advising their investor clients and to investors making investment decisions. Tr. 406–10, 417–20 (Schroeder testimony); Tr. 3549–51, 3630–31 (Cohen testimony). This is because if an insurance company's loss reserves are too low, in the future the company could have to take money away from profits to pay for claims it previously did not adequately account for. Tr. 407–11 (Schroeder testimony); Tr. 3549–50 (Cohen testimony). This possibility, in turn, negatively affects the quality of the company's earnings, which is of considerable importance to investors. Tr. 419–20 (Schroeder testimony); Tr. 3549–50 (Cohen testimony). A demonstrated trend of growing premiums but declining reserves could be evidence that the company was under-reserved and that the company could be forced to take a "charge" to future earnings. Tr. 410–11 (Schroeder testimony); Tr. 3549–50, 3630 (Cohen testimony). Because of this, if Schroeder and Cohen had known that AIG's reserves had declined over the second two quarters of 2000 and the first quarter of 2001, they would have advised their clients to be more cautious about investing in AIG. Tr. 496–99, 501–03 (Schroeder testimony); Tr. 3630–31, 3684 (Cohen testimony). Schroeder testified that in March 2001, just after AIG released its fourth quarter 2000 financial statement, she upgraded her assessment of AIG stock after Greenberg, AIG's CEO, personally assured her that the company was not under-reserved. Tr. 470–71, 73 ("Q: What did Mr. Greenberg say to you in response to your inquiry about the loss reserves? A: He expressed confidence in the reserves."). Had Schroeder known that loss reserves had actually declined in the fourth quarter of 2000, she "almost certainly" would not have upgraded her assessment of AIG's stock in March 2001. Tr. 502–03. This testimony provides a basis for the jury to conclude that accurate information about loss reserves was important to investors, and that the type of misstatements AIG made about its loss reserves—disguising a three quarter decline in reserves during a corresponding period of premium growth as an isolated one quarter event—would have been particularly significant to investors, especially in light of the implications for the quality of AIG's earnings, a central concern for investors. This evidence also permits the inferences that AIG's misstatements purposely hid a potentially negative trend of declining loss reserves during a period of premium growth, sought to hide its failure to meet analysts expectations that the company had sufficient loss reserves, and misled investors about the quality of the company's earnings. Considering this evidence in its entirety, and drawing all inferences in favor of the government, the Court finds that a rational jury could conclude that AIG's misstatements about its loss reserves were material to investors.[13]

including AIG. Tr. 3544–45. His clients included institutional investors such as hedge funds, pension funds, and mutual funds. Tr. 3546.

13. In reaching this conclusion, the Court also notes that a misstatement is material so long as investors would consider the misstated facts significant in making investment decisions, even if investors would consider other information to be more important. *See Ganino,* 228 F.3d at 162 (holding an investment decision need not hinge on misstated facts); *United States v. Reyes,* No. 06–00556–1, 2007 WL 2554227, at *3 (N.D.Cal. Aug. 27, 2007) ("In other words, although investors consider some information *more important* than non-cash compensation expenses, it does not follow that they consider stock options expenses *unimportant.*") (emphasis in original).

Other qualitative factors, though not decisive, further support the jury's conclusion that the misstatements were material. The government presented evidence that Greenberg, AIG's CEO, initiated the LPT to counteract industry analysts' negative reactions to AIG's reported third quarter 2000 decline in loss reserves. *See* SAB No. 99, 64 Fed.Reg. at 45152 ("While the intent of management does not render a misstatement material, it may provide significant evidence of materiality."). Hamrah testified that Greenberg was always highly interested in AIG's stock price and was "unhappy" when, on the day AIG publicly released its financial results for the third quarter of 2000, he learned of analysts' concerns and the stock price's decline. Tr. 244, 249. Richard Napier, a former senior vice-president at Gen Re and a cooperating witness for the government,[14] testified that Greenberg had called Ferguson after AIG publicized its financial results for the third quarter of 2000 and asked Ferguson to help him obtain loss reserves for a six to nine month period. Tr. 649–652, 655–658. Napier, whom Ferguson tasked with coordinating the deal at Gen Re, understood from the outset that Greenberg wanted a deal with the primary purpose of transferring loss reserves from Gen Re to AIG. Tr. 657–59, 663, 673. Napier believed that Greenberg wanted the deal because of analysts' negative reactions to AIG's third quarter 2000 decline in loss reserves, and Napier testified that Ferguson and defendant Milton, the chief reinsurance officer for AIG and Napier's

contact at AIG, also held this opinion. Gov. Ex. 8; Tr. 668–69, 673, 719. After the deal took effect, in the fourth quarter of 2000 and the first quarter of 2001, even though it was a no-risk deal for AIG, Greenberg explicitly pointed out the "growth" in AIG's loss reserves for those periods in the company's quarterly earnings press releases for investors and analysts. Gov. Ex. 114, 153; Tr. 278–79, 294–95. It was also during this period that Greenberg "expressed confidence" in AIG's reserves in response to specific inquiries from industry analysts. Tr. 470–71 (Schroeder testimony). From this evidence, the jury could have inferred that management at AIG, assisted by management at Gen Re, intended to deceive AIG's investors about the true state of AIG's loss reserves to quell recent market criticism. This inference provides additional support for the materiality of AIG's misstatements. *See* SAB No. 99, 64 Fed.Reg. at 45152.

Finally, the fluctuations in AIG's stock price after evidence of the misstatements was publicly revealed further weighs in favor of the misstatements' materiality. The government presented evidence at trial that AIG's stock price declined in February and March of 2005 after it was publicly revealed that government regulators were investigating the LPT and that AIG and Gen Re's senior management had been involved with the deal.[15] Gov. Ex. 243, 244A, 245A, 248A, 314, 315, 316; Tr. 303–04, 371 (Hamrah). Although this factor is not determinative, the jury could

**14.** Although Ferguson urged the Court to disregard Napier's testimony as unreliable when he first moved for a judgment of acquittal during the trial, the jury's verdict now requires the Court to credit Napier's testimony. *Autuori*, 212 F.3d at 118 ("It is not for the court on a Rule 29 motion to make credibility determinations.").

**15.** The Court further notes that the jury also could have considered evidence of AIG's

management's involvement with the misstatements as weighing in favor of the misstatements' materiality to investors. *See Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 659 (4th Cir.2004); *Gebhardt v. ConAgra Foods*, 335 F.3d 824, 829–30 (8th Cir.2003); *Zell v. InterCapital Income Secs., Inc.*, 675 F.2d 1041, 1046 (9th Cir.1982); *United States v. Ferguson*, 545 F.Supp.2d 238, 240 (D.Conn. 2008) (discussing admissibility of evidence for this purpose).

have considered this evidence as supporting the significance of the misstatements to investors. *Bilzerian*, 926 F.2d at 1298 ("stock movement is a factor the jury may consider relevant" to materiality of public misstatements); SAB No. 99, 64 Fed.Reg. at 45152 ("[a]mong other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material").

After taking these qualitative factors into account, drawing all inferences in favor of the government, and considering the evidence discussed above, the Court finds sufficient support in the record to sustain the jury's finding that AIG's misstatements about its loss reserves were material.[16] Ferguson's and Garand's motion for judgments of acquittal on this basis, therefore, are denied.

### D. Ferguson's Other Arguments

Defendant Ferguson also moved under Rule 29 for a judgment of acquittal in conjunction with his written motion for a mistrial pursuant to *United States v. Geaney*, 417 F.2d 1116, 1121 (2d Cir.1969), arguing for a judgment of acquittal should the Court deny his *Geaney* motion. Draw-

ing all inferences in favor of the government and the jury's verdict, the Court denies Ferguson's Rule 29 motion for the reasons discussed below.[17]

■ Ferguson made several arguments in support of his motion, none of which provide an adequate basis for granting it. First, Ferguson argues that, in considering the sufficiency of the evidence against him, the Court should discount the testimony of Richard Napier as unreliable. Since the Court reserved decision on Ferguson's motion until after the jury's verdict, however, the Court may not make its own credibility assessments of the government's witnesses. *Autuori*, 212 F.3d at 118 ("Where there is conflicting testimony at trial, we defer to the jury's resolution of the witnesses' credibility.") (citation omitted). Ferguson argued Napier's credibility to the jury; post-verdict, the Court cannot revisit the jury's credibility determination absent extraordinary circumstances that are inapplicable here.[18] *Id.*; *see United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992) (holding, in context of Rule 33 motion, that "[w]here testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation").

16. The Court rejects Ferguson's contention that the government presented no evidence of the misstatements' materiality after the first quarter of 2001. Ferguson points to no evidence in the record indicating that the same qualitative considerations that support the statements' materiality in the fourth quarter of 2000 and the first quarter of 2001 did not apply for the entire period in which AIG included the misstatements in its financial statements, and he identified no evidence showing that investors would have considered these misstatements unimportant after the first quarter of 2001. Until AIG restated its financial statements in May 2005, the LPT's artificial inflation of AIG's publicly reported loss reserves by $500 million prevented investors and analysts from suspecting that AIG could have been under-reserved and could be

forced to take a $500 million charge to future earnings. *See* Gov. Ex. 250; Tr. 496–99, 501–03 (Schroeder testimony); Tr. 3630–31, 3684 (Cohen testimony). Although Ferguson correctly points out that AIG's reserves steadily increased after the first quarter of 2001, when presumably no other fraudulent deals provided additional padding for AIG's reported loss reserves, he presented no evidence that these increases compensated for the $500 million of illusory reserves attributable to the LPT.

17. The Court denied Ferguson's *Geaney* motion during the trial. Tr. 4182.

18. The Court notes, however, that Napier's testimony was strongly corroborated by other witness testimony and exhibits, and that the Court found his testimony credible.

▆▆ Second, Ferguson argues that no rational jury could find that the charged conspiracy began on or about October 31, 2000, the date charged in the Superseding Indictment. Ferguson argues that, at the earliest, the conspiracy could not have started until November 13, 2000, because there was no evidence that a no-risk deal was considered prior to this date. However, the government presented sufficient evidence that, starting with Greenberg's October 31, 2000 phone call to Ferguson, there was an agreement to carry out a transaction to artificially inflate AIG's loss reserves and deceive AIG's investors about the amount of the company's loss reserves and the quality of its earnings. A conspiracy is formed when its members agree to participate in "a collective venture directed toward a common goal." *United States v. Maldonado–Rivera*, 922 F.2d 934, 963 (2d Cir.1990). The means by which the goals of the conspiracy are accomplished need not be set from the outset of the agreement. *See id.* ("The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan."). The government presented evidence that, on October 31, 2000, Greenberg called Ferguson to initiate a transaction through which AIG would reinsure Gen Re, but there was no evidence that Gen Re needed or wanted reinsurance coverage prior to Greenberg's call, and, in previous transactions, it was usually Gen Re—a reinsurance company—that reinsured AIG and other insurance companies. Tr. 656–57 (Napier testimony); Gov. Ex. 6. Even though calculating loss reserves usually requires an actuarial assessment after the fact, *see* Tr. 358–59 (Hamrah testimony), Greenberg specified the amount of loss reserves he wanted from the deal during that call. Tr. 657–59 (Napier testimony); Gov. Ex. 6. Further, Greenberg asked for a short-term transaction lasting only six to nine months, but he specified that he wanted the portfolio of insurance contracts ceded through the deal to contain longer tailed lines of business, thereby minimizing any potential losses to AIG. Gov. Ex. 8; Tr. 669–70 (Napier testimony); *see* Tr. 663 (Napier testimony) ("Chris [Milton's] comment was that he had had a conversation with Hank Greenberg and that, basically, as he understood it, they wanted to rent some reserves or borrow some reserves."). After Ferguson's conversation with Greenberg, Ferguson charged Napier with coordinating a response to Greenberg's request. Tr. 660. Napier's email update to Ferguson and others the following day confirmed that AIG "only want[ed] reserve impact," and that, as a consequence, AIG would accept a funds-withheld deal, which would not require Gen Re to make any premium payments to AIG. Gov. Ex. 8; Tr. 667–68, 672 (Napier testimony). Napier's email further noted that Ferguson was concerned that the deal should be structured to avoid creating "reporting problems" for Gen Re. Gov. Ex. 8; Tr. 667 (Napier testimony) ("Q: And what did you understand that to mean, reporting problems of our own? A: That we didn't want to do anything that would distort the financials of General Reinsurance."). Regardless of whether the final structure of the deal took shape in mid-November 2000, this evidence provides an adequate basis for a rational jury to conclude that the conspiracy to artificially inflate AIG's loss reserves and deceive the company's investors started with Greenberg's call to Ferguson on October 31, 2000.

▆▆ Lastly, Ferguson argues that the government presented insufficient evidence that a secret side agreement ensured that the LPT was a no-risk deal, and that Ferguson knew of it and agreed to it as part of the overall deal. This argument, however, is also unavailing, in light of the evidence at trial supporting both

inferences. *See United States v. Jones*, 393 F.3d 107, 111 (2d Cir.2004) (holding that "[e]vidence tending to show knowing participation in the conspiracy" is sufficient to sustain conspiracy conviction). The government presented sufficient evidence for a rational jury to find that the secret side deal existed and rendered the LPT no-risk for AIG. John Houldsworth [19] testified that when he drafted the terms of the written contracts, he knew that AIG did not want to incur any losses from the transaction. Tr. 2139–40, 2142. Because of this, although his draft contracts appeared to transfer risk to AIG, a separate oral agreement ensured that (1) AIG would not be charged for any losses under the contracts, and (2) AIG would pay Gen Re a fee for undertaking the transaction and repay Gen Re for the premium it paid under the written contracts' terms. Tr. 2144–45 ("[I]f we had those losses, we weren't going to be charging AIG. That wasn't with my understanding of what we wanted to do. And ... the $10 million we were going to pay AIG, we would have to get that paid back plus an actual fee for doing the deal."). Houldsworth explained that he did not include these additional terms in the written contracts in order to maintain the appearance of risk transfer through the transaction so that AIG could account for the deal as reinsurance, thereby boosting its loss reserves, and to conceal the unusual fact that AIG was paying Gen Re to do the deal. Tr. 2145 ("[I]f I put them in there it wouldn't look like a reinsurance contract. And obviously the intention from what the start was, they were going to have a piece of paper that would allow them to book that contract as a reinsurance deal which has to have risk transfer."). Napier's contemporaneous

emails to the defendants and other co-conspirators, as well as his trial testimony, show that an outside agreement ensured AIG would not suffer any losses from the written contracts, and that Gen Re would be paid for its participation in the deal and repaid its premium payment. *See, e.g.*, Tr. 815 (discussing Greenberg and Ferguson's agreement on fee amount), 816–17 (discussing remaining issue of means by which premium and fee would be recovered by Gen Re), 818 ("Q: What else do you recall about Mr. Ferguson telling you about his call with Greenberg? A: That he confirmed that AIG would not be bearing risk."); Gov. Ex. 31 (November 17, 2000 email noting the fee amount of 1% and raising issue of how Gen Re will recover it and its premium payment). Other evidence also strongly implied that those at AIG familiar with the transaction knew that, despite the written terms of the deal, it entailed no risk for AIG: no one from AIG ever asked Gen Re for the documents necessary to conduct an actuarial analysis of the risk associated with the $500 million of contracts Gen Re ostensibly ceded to AIG through the deal. Tr. 3426–38 (Houldsworth testimony). Additionally, Jay Morrow, an internal AIG accountant reviewing the transaction, testified that defendant Milton indicated that "he did not have the [underwriting] data [for the transaction] and was not able to keep it," and that Milton gave him the "impression ... that he had already reviewed the data," Tr. 1912–14 (Morrow testimony), even though neither Milton nor anyone else at AIG ever even requested it from Gen Re. Tr. 3426–38 (Houldsworth testimony). Finally, evidence showing the fee payment and premium repayment from

---

**19.** At the time of the deal, John Houldsworth, a co-conspirator and cooperating witness for the government at trial, was the CEO of CRD, the Gen Re subsidiary that served as Gen Re's nominal party to the LPT. Tr. 2137, 2150,

2156–58; *see supra* note 3. After being recruited to work on the deal by defendant Monrad, he drafted the initial contract that ultimately became the LPT. Tr. 2138–46.

AIG to Gen Re provides still more support for the existence of this side agreement.[20] Tr. 3831–59 (Postal Inspector Tendick testimony explaining series of contracts and wire transfers used to distribute $5 million fee and $10 million premium payment back to Gen Re). Based on this evidence, a rational jury could find that an agreement outside of the written LPT contracts ensured that AIG assumed no risk from the deal, that AIG repaid Gen Re's $10 million premium payment under the contracts, and that AIG paid Gen Re an additional $5 million for undertaking the transaction.

Ample evidence also supports the jury's conclusion that Ferguson knew of and agreed to this side deal as part of the conspiracy. Ferguson reviewed John Houldsworth's November 15, 2000 email, to which the draft LPT contract was attached, in which Houldsworth explicitly stated that Gen Re "will not transfer any losses under this deal" and discussed AIG's payment of a fee to Gen Re for undertaking the deal, as well as AIG's repayment of Gen Re's $10 million premium payment.[21] Gov. Ex. 23. Napier testified that he, Ferguson, and Monrad discussed Houldsworth's draft contract as a no-risk deal during a meeting on the same day. Tr. 804–05. Napier also testified that, after this meeting, Ferguson discussed the proposed deal with Greenberg, including the fact that AIG would not bear risk from the deal, and told Greenberg that Gen Re wanted a fee for agreeing to complete the deal in addition to repayment of Gen Re's premium payment. Tr. 815–18; Gov. Ex. 30. Emails Ferguson received from Monrad, Napier, and Houldsworth in 2001 concerning the manner by which Gen Re would recover its premium payment and fee from AIG further undermine Ferguson's claimed ignorance of the side deal, as do email updates Ferguson continued to receive and forward to other co-conspirators through the fall of 2001 concerning Gen Re's recovery of the premium and the fee. *See, e.g.,* Gov. Ex. 105, 170, 172, 175, 177, 186. From this, as well as other evidence in the record, a rational jury could conclude that Ferguson knew that a side agreement rendered the LPT a no-risk deal for AIG and guaranteed Gen Re the return of its premium payment in addition to a fee for participating in the transaction. *Cf. United States v. Snow,* 462 F.3d 55, 68 (2d. Cir.2006) ("It is axiomatic that mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in [a] conspiracy.... However, where the government presents evidence tending to show that the defendant was present at a crime scene under circumstances that logically support an inference of association with the criminal venture, a reasonable juror could conclude the defendant was a knowing and intentional criminal conspirator.") (citations and internal quotation marks omitted).

Accordingly, as there is sufficient evidence in the record from which a rational jury could conclude that the charged conspiracy began on or about October 31, 2000, that the LPT was a no-risk deal for AIG due to a side agreement outside the terms of the written contract, and that Ferguson knew the deal was no-risk and agreed to it nonetheless, his Rule 29 motion is denied.

---

**20.** Ferguson argues that the government's evidence of the fee paid to Gen Re shows an increased risk to AIG from the deal, not that the deal was no-risk. After the jury's verdict, however, the Court cannot reexamine the weight of the evidence, and must draw all inferences in favor of the government.

**21.** Ferguson's former secretary, Donna Rizzi, confirmed that Ferguson's handwriting appeared on a paper copy of this email found in Ferguson's files relating to the deal. Tr. 1865.

### E. Defendants' Oral Motions for a Judgment of Acquittal

During the trial, all five defendants orally moved for a judgment of acquittal pursuant to Rule 29(a) at the end of the government's case and at the close of all evidence, but the defendants neither submitted papers in support of these oral motions nor argued them in court.[22] Tr. 4111–4112; 4182–84. In accordance with Rule 29(b), the Court reserved decision on the motions until after the jury's verdict or discharge. After the verdict, all five defendants filed post-verdict Rule 33 motions, which are addressed below, but none of the defendants filed post-verdict Rule 29 motions. Rather, in a letter to the Court, the defendants explained that they had jointly decided against filing post-verdict Rule 29 motions and chose to rest on their oral motions during the trial; in light of this decision, they submitted no written memoranda supporting their motions and asked the Court to resolve those motions solely on the trial record and without oral argument. Letter from Counsel for Christopher P. Garand to the Court (Apr. 3, 2008) ("Defendants make no request for oral argument . . . on those pending Rule 29(a) motions. . . . We apologize to the Court if there was any confusion caused by defendants' decision not to file post-trial Rule 29(c) motions."). The defendants reiterated this request in other post-verdict submissions to the Court. Defs. Joint Mem. of Law in Supp. of Their Mot. in the Alternative for a New Trial, 1 n.1, April 3, 2008 ("Defendants do not seek oral argument on their Rule 33 motions, nor on their pending Rule 29(a) motions made at trial. Defendants respectfully withdraw their request for the oral argument currently scheduled for May 1, 2008."); Letter from Counsel for Ronald E. Ferguson to the Court (Apr. 21, 2008) ("We have now reviewed the government's opposition brief and we respectfully submit that, on behalf of Mr. Ferguson, we do not believe there is a need for oral argument.").

After reviewing the evidence presented at trial, including the evidence discussed above in the context of defendant Ferguson's written Rule 29 motions, the arguments made in Ferguson's written Rule 29 submissions, and the government's papers opposing all of the defendants' Rule 29 motions, the Court concludes that there was sufficient evidence in the record to support all counts of conviction for defendants Ferguson, Garand, Graham, Milton, and Monrad. Therefore, their Rule 29 motions are denied.

### III. Motions to Sever

During the trial, at the same time that the defendants orally moved for a judgment of acquittal under Rule 29, they also made renewed motions, in the alternative, for severance from the other defendants pursuant to Rule 14.[23] As this ruling denies the defendants' Rule 29 motions in full, the Court now addresses the defendants' severance motions.

▆▆▆▆▆▆ All five of the defendants moved for a severance on several occasions during the pre-trial stages of this case and during the trial. Each time, the Court denied the defendants' motions. "There is a strong preference in the federal system for joint trials of defendants who are in-

---

22. As the Court already noted above, defendant Ferguson also made written motions pursuant to Rule 29 that defendant Garand joined. Beyond this, however, neither of these defendants provided any papers or arguments in support of the generalized oral Rule 29 motions they made during trial.

23. Counsel for defendant Milton made the motion, and counsel for the other four defendants orally joined Milton's motion. Tr. 4182–84. None of the defendants submitted papers supporting these motions or argued them before the Court.

dicted together." *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). "This preference is particularly strong where ... the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh,* 152 F.3d 88, 115 (2d Cir.1998). Although district courts have discretion to grant a severance under Rule 14(a), they should only do so "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. A defendant seeking a severance bears the burden of establishing this significant risk. *See United States v. Megale,* 363 F.Supp.2d 359, 366 (D.Conn.2005) (citing *United States v. Blount,* 291 F.3d 201, 209 (2d Cir.2002)). The risk of prejudice is heightened in a complex case involving numerous criminal defendants. *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. At the same time, however, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id.* at 540, 113 S.Ct. 933.

 After reviewing the trial record, the Court concludes that none of the defendants' trial rights was violated by their joint trial. The Court reaches this conclusion for the same reasons articulated in its written pre-trial rulings addressing the defendants' severance motions and the Court's oral rulings at trial. In addition, the Court notes that several factors weigh heavily against granting the defendants' motions. First, although the defendants did not present entirely identical defenses, their defenses were certainly not antagonistic to the point of significantly prejudicing any co-defendant. *Blount,* 291 F.3d at 209 ("A trial need not be severed simply because codefendants raise conflicting defenses."); *United States v. Villegas,* 899 F.2d 1324, 1346 (2d Cir.1990) ("[A] defendant satisfies his burden of showing sub-stantial prejudice only if it can be said that the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant.") (internal quotation marks omitted).

Second, all of the charged crimes, including the conspiracy and the substantive objects of the conspiracy, stemmed from a common set of facts—specifically, from one reinsurance transaction. *Salameh,* 152 F.3d at 115 ("[The] preference [for joint trials] is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme."). Although, as is inevitable in a joint trial, some evidence was admitted against only certain defendants and not others, this did not cause substantial prejudice to any defendant that warranted separate trials. *United States v. Chang An-Lo,* 851 F.2d 547, 557 (2d Cir.1988) ("[I]t is well established that differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials."); *see Salameh,* 152 F.3d at 115 (noting that prejudice due to the admission of evidence against codefendants "is an unlikely occurrence when all the defendants are charged under the same conspiracy count"). Any risk of prejudice could have been averted by limiting instructions to the jury. *Zafiro,* 506 U.S. at 539, 540, 113 S.Ct. 933 ("less drastic measures [than separate trials], such as limiting instructions, often will suffice to cure any risk of prejudice"). The Court did, in fact, give such an instruction with regard to certain evidence, *see, e.g.,* Tr. 749–50; on several other occasions where the instruction would have been appropriate, however, the defendants asked the Court not to give it. Tr. 2427 ("The Court: [D]o you want the limiting instructions that I mentioned in my opinion? Mr. Hafetz: Judge, I think limiting instructions are death.... It just

stresses—the answer in short is no, your Honor. It's futile."). Absent any other evidence of prejudice, the defendants' strategic choice to forgo this type of instruction during the trial does not warrant granting their subsequent severance motions. *See Zafiro*, 506 U.S. at 540, 113 S.Ct. 933 (" 'juries are presumed to follow their instructions' " (quoting *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987))).

Finally, as the Court already discussed above, there was sufficient evidence in the record to convict each defendant of each count against him or her. *See United States v. Sampson*, 385 F.3d 183, 194 (2d Cir.2004) (affirming conviction on misjoined count where government presented overwhelming evidence of guilt including videotapes played for the jury). " 'The strength of the government's case against the defendant is probably the most critical factor in determining whether an error affected the verdict.' " *United States v. Tubol*, 191 F.3d 88, 97 (2d Cir.1999) (quoting *United States v. Colombo*, 909 F.2d 711, 714 (2d Cir.1990)). In light of the strength of the evidence presented against each of the defendants, no defendant could have been unduly prejudiced by the joint trial. *See Zafiro*, 506 U.S. at 540, 113 S.Ct. 933 ("defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials"); *Sampson*, 385 F.3d at 194.

Accordingly, the defendants' Rule 14 motions are denied.

### IV. Rule 33 Motions

All five defendants seek limited relief under Rule 33. Rule 33, by its terms, gives the trial court " 'broad discretion ... to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.' " *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir.2001) (quoting *United States v. Sanchez*, 969

F.2d 1409, 1413 (2d Cir.1992)). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Id.* at 134. The burden of persuasion is on the defendant to demonstrate that a new trial is appropriate. *United States v. Sasso*, 59 F.3d 341, 350 (2d Cir.1995).

The defendants seek a new trial under Rule 33 only in the event that the Court grants any portion of their Rule 29 motions. The defendants argue that, should the Court determine that the government presented insufficient evidence at trial to sustain one or more (but not all) of the counts of conviction, the Court should grant a new trial on the remaining counts of conviction out of concern for prejudicial spillover to the defendants for those remaining counts. *See United States v. Rooney*, 37 F.3d 847, 855 (2d Cir.1994) ("When confronted with a problem of taint, we must consider whether the presence of the [invalidated] count had any spillover effect sufficiently prejudicial to call for reversal of the remaining counts." (internal quotation marks omitted)); *United States v. Jones*, 16 F.3d 487, 493 (2d Cir.1994) ("[p]rejudicial spillover from evidence used to obtain a conviction subsequently reversed on appeal may constitute compelling prejudice" that requires a new trial). The defendants contend that the jury's consideration of the remaining counts could have been unduly influenced by its consideration of the counts for which insufficient evidence was presented at trial, and so a new trial for those remaining counts is required. *See, e.g., United States v. Scotti*, 47 F.3d 1237, 1247 (2d Cir.1995) (recognizing risk of spillover prejudice to defendants on conspiracy count where government presented insufficient evidence to sustain conviction for substantive crimes).

In light of the Court's above ruling denying the defendants' Rule 29 motions in

their entirety, the Court need not address the merits of the defendants' request for limited relief under Rule 33. Accordingly, the defendants' Rule 33 motions are denied as moot.

## V. Conclusion

For the above reasons, the defendants' oral and written Rule 29 motions [docket # s 951, 955, 956] and their oral motions to sever are denied. The defendants' written Rule 33 motions [docket # s 1011, 1012, 1013, 1016, 1017] are denied as moot.